United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2005**

Charles R. Fulbruge III
Clerk

REVISED APRIL 29, 2005
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-20875

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNEST NDA AKPAN; CHIJIOKE VICTOR
OKORO, MD, also known as Victor
Okoro, also known as Chiji V.
Okoro

Defendants-Appellants.

--------------------
Appeal from the United States District Court
for the Southern District of Texas
(H-01-CR-399-2)
--------------------

Before WIENER and PRADO, Circuit Judges, and LITTLE,[*] District
Judge.

WIENER, Circuit Judge:

Defendant-Appellant Ernest Nda Akpan appeals his conviction
and sentence after a jury trial for mail fraud in violation of 18
U.S.C. § 1341. Defendant-Appellant Chijioke Victor Okoro appeals
his conviction and sentence after a jury trial for fifteen counts
of mail fraud in violation of 18 U.S.C. § 1341, three counts of
filing false tax returns in violation of 26 U.S.C. § 7206(1), and

---

[*] District Judge of the Western District of Louisiana, sitting
by designation.

seven counts of healthcare fraud in violation of 18 U.S.C. § 1347. Finding no error in the district court's rulings or the jury trial, we affirm Akpan's and Okoro's convictions. We also affirm Akpan's sentence, but, in light of the Supreme Court's opinion in United States v. Booker[1] and our recent opinion in United States v. Mares,[2] we vacate Okoro's sentence and remand for resentencing.

## I. FACTS AND PROCEEDINGS

Doctor Okoro is a native of Nigeria who came to the United States to attend college in the 1970s. He received an undergraduate degree in chemistry and graduated from medical school. As a licensed physician, Okoro practiced medicine in the United States from 1981 until 2002. He also developed a medical missionary program to bring medical care to his native Nigeria. Between 1984 and 2000, Okoro traveled to Nigeria twice a year to provide medical care to impoverished Nigerians. In 1989, Okoro moved to Houston, Texas to work as an emergency room doctor at Memorial Hospital Northwest ("Memorial"). In 1990, Memorial promoted him to the Director of the Emergency Department, a position that he held until his arrest. In 1999, Okoro became a United States citizen.

### A. Mail Fraud

---

[1] —— U.S. —— , 125 S.Ct. 738 (Jan. 12, 2005).

[2] —— F.3d ——, 2005 WL 503715 (5th Cir. Mar. 4, 2005).

Okoro also worked for the Westchase Clinic ("Westchase") until it closed in 1995, when he began work for Westchase's successor, Spectrum Medical Clinic ("Spectrum"). Okoro and Akpan worked together at both Westchase and Spectrum. In 1996, Spectrum was dissolved and became Houston Medcare ("Medcare"), a minor injury clinic owned by Okoro. Many of Spectrum's employees joined Okoro at Medcare. Most importantly, Okoro hired Akpan as Medcare's administrator to work with lawyers and insurance company representatives to ensure that the clinic received payment for the services that it rendered. Akpan coordinated the transfer of patients from Spectrum to Medcare and also supervised Spectrum's office staff.

In March 1996, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), and the United States Department of Health and Human Services ("DHHS") began to investigate attorneys and physicians suspected of submitting false claims to insurance companies for non-existent medical services purportedly provided to victims of motor vehicle accidents. The results of the undercover investigation by FBI Special Agent Lorraine Tucker and Houston Police Officer Sheryl Jefferson reveals the fraudulent scheme alleged by the government in the indictment against Okoro and Akpan.

Tucker (posing as "Lorraine Bell") and Jefferson (posing as "Sheryl King") took out insurance policies under their aliases in cooperation with representatives of the United Services Automobile

Association ("USAA").[3]  They then filed a fictitious accident report that listed Jefferson as the driver.

Tucker received a phone call on her undercover telephone from an individual who identified herself as Cindy Halla, allegedly a representative of a Christian organization called Sisters of Grace. Halla informed Tucker that the Sisters of Grace provided transportation and referrals for victims of car accidents. Halla's associate, Walter Oji, picked up Tucker at her undercover apartment and took her to Spectrum, which was then still in operation. Tucker wore a hidden recording device during this first visit to Spectrum.  When they arrived at the clinic, a Spectrum employee gave Tucker some paperwork to complete.  She filled it out and gave it to Oji, who then gave it to the receptionist.

Claudia Ramon, a Spectrum nurse, led Tucker to the back of the clinic, where Ramon recorded Tucker's height, weight, and blood pressure and told her that a doctor would be in to see her shortly. Dr. Sunil Vachhani, a licensed chiropractor employed by Okoro, examined Tucker.  She informed him that her right shoulder hurt. Dr. Vachhani recommended that Tucker receive physical therapy, but she received none during her first visit.  After Dr. Vachhani examined Tucker, Oji took her to the law offices of Gabriel Giwa, whom she retained to recover payment from USAA for the injuries that she had received in the purported car accident.

---

[3] For ease of comprehension, we refer to Tucker and Jefferson by their real names.

4

Oji again transported Tucker to Spectrum in late March 1996. Tucker asked Oji if she should sign in for Jefferson as well, and Oji informed her that she could if she wanted. Tucker wrote both of their undercover names on the sign-in sheet. Ramon led Tucker to an examination room, where she handed Tucker a sheet of yellow paper that contained multiple dates. Ramon asked Tucker to record the dates in her patient file. Tucker then signed the daily sign-in sheets for the month of March, as well as the daily sign-in sheets for all of the days listed on the yellow paper.

Tucker told Ramon that her roommate Jefferson had been in the same accident but that Jefferson was out of town. Ramon told Tucker that she would speak to her superior about Jefferson. Ramon then introduced Tucker to Akpan, to whom Tucker spoke about Jefferson. Akpan told her that "he would work something out" and would contact their attorney.

In April 1996, Tucker returned to Spectrum by herself. She signed in as usual, and Ramon again gave her a sheet of paper that contained multiple dates. Tucker recorded the dates into her patient file and signed her name on the corresponding daily sign-in sheets. Ramon told Tucker to bring Jefferson with her on her next visit.

On May 1 and 9, 1996, Tucker returned to Spectrum with Jefferson. During the May 9 visit, Tucker and Jefferson met with Akpan. When he asked Jefferson why she had not visited Spectrum earlier, she explained that she had been out of town. Akpan told

5

them that he would help them but that they should not tell others, explaining that car accident lawsuits often settled and that problems arose when the lawyers distributed the settlement funds. Akpan also told them that patients often denied the amount of services that they received at the clinic to avoid payment. Akpan explained that he would get his money and asked if they "were all together on that." Tucker and Jefferson assured him that they were. At the close of the meeting, Ramon provided both Tucker and Jefferson with more sign-in sheets for multiple future dates, which they signed.

Spectrum ultimately billed USAA $1550 for services rendered to Tucker, claiming 27 physical therapy treatments from March 20 to May 9, 1996. Spectrum also billed USAA $3190 for Jefferson's medical treatment, also for 27 visits between March 20 and May 9, 1996, with multiple treatments rendered on the same day. Okoro's signature appeared on much of the paperwork, even though Okoro had never examined either Tucker or Jefferson. In fact, neither Tucker nor Jefferson had ever even met Okoro.

The "sign-in" scheme was replicated with many of the clinic's patients — Minh Nguyen, Audrey Santos, Simon Mosongo, Yolanda Coleman, Rebecca Whitfield, Dexter Hall, Iyomo Louison, Lora Goree, Halane Dunn, and Manuel Roth. Although some of the patients received physical therapy treatments and some were examined by Okoro, each patient signed blank sign-in sheets and blank patient forms. In addition, Okoro signed most of the forms himself, yet

6

many of the patients testified that he had never examined them, and the evidence at trial demonstrated that he was out of the country — in Nigeria — during many of their "visits."

**B.    Healthcare Fraud**[4]

Okoro also worked with 21 other physical therapy clinics. Medicare issues a group number to each health care facility and an individual provider number to physicians within the facility. Physicians must complete a "reassignment of benefits" application to allow the facility to bill Medicare for the physician's services.    Medicare then reimburses the facility under the physician's provider number.   The facility may bill Medicare for services that the physician renders only when he is present.

Between 1998 and 2000, Okoro received individual provider numbers in connection with 21 physical therapy clinics.   These clinics were owned by Akpan, Sekibo Williams, a foreign medical student who worked at Medcare, and Henry Johnson, Spectrum's previous   owner.    In  total,   the  clinics  billed  Medicare $9,788,724.76, and Medicare paid a total amount of $4,192,544.16 to the clinics.   Of this amount, Okoro received $324,373.87 from the clinics between 1999 and 2001.

The evidence at trial demonstrated that many of the physical therapy clinics billed Medicare for services that Okoro allegedly rendered after he deactivated his individual provider number for

---

[4] Okoro does not appeal his conviction for tax fraud.

that clinic. In addition, Okoro signed patient documents that stated that he had treated those patients on specific dates and at specific times on which Okoro could not possibly have rendered services. For example, many of the dates on which Okoro alleged that he provided services were dates when he was in Nigeria.

**C.  Indictment and Trial**

In May 2001, a federal grand jury returned a 22-count indictment against Okoro and Akpan. The following February, a grand jury returned a 25-count second superceding indictment against Okoro, Akpan, as well as counts against Claudia Ramon, Guadalupe Castro, and Ana Lilia Garcia. The district court severed the charges against these additional defendants before trial, and they are not a subject of this appeal. Counts one through 15 of the second superceding indictment charged Okoro with aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Counts 16 through 18 charged Okoro with filing false federal income tax returns in violation of 26 U.S.C. § 7206(1). Counts 19 through 25 charged Okoro with health care fraud in violation of 18 U.S.C. § 1347. Count One charged Akpan with mail fraud in violation of 18 U.S.C. § 1341.

Trial against Okoro and Akpan began in September 2002. After deliberating, the jury found Okoro guilty on all twenty-five counts and found Akpan guilty on Count One. Akpan timely filed a motion for a new trial, which the district court denied. In August of the

8

following year, the district court sentenced Akpan to 41 months in the custody of the Bureau of Prisons on count one. One month later, the district court sentenced Okoro to 120 months imprisonment for the mail and healthcare fraud violations. The district court also sentenced Okoro to a 31-month sentence for tax fraud to run consecutively to the 120-month sentence for mail and healthcare fraud. Both Okoro and Akpan timely filed notices of appeal.

## II. ANALYSIS

### A. Motion for a Mistrial

Okoro and Akpan (collectively, "appellants") first argue that the district court abused its discretion when it refused to grant their motion for a mistrial grounded in the court's allowing the jurors to remove the government's summary trial notebooks from the courtroom before trial started. We review a district court's refusal to grant a mistrial for abuse of discretion.[5]

After the court empaneled the jury, it instructed the jurors: (1) not to seek outside information about the case; (2) not to discuss experiences that were not in evidence; (3) not to discuss the case or the evidence with anyone — their spouse or among themselves — before the district court's final instructions; (4) to keep an open mind about the evidence; and (5) not to form an

---

[5] <u>United States v. Moreno</u>, 185 F.3d 465, 475 (5th Cir. 1999).

opinion until they had heard all of the evidence.  The district court then recessed for lunch.

During the recess, the government received permission from the district court to place summary notebooks on each juror's chair. The summary notebooks contained "key" documents of the government's case against appellants.  Specifically, each notebook contained excerpts of government exhibits one to forty-three.  Before jury selection, the district court had entertained appellants' objections to the exhibits in the summary notebooks but had admitted all of them.[6]

After the jury returned from lunch, the court recessed for the day and informed the jury that opening statements would begin the next day.[7]  As the jury left the courtroom, one juror asked the district court if they could take the summary notebooks with them. The district court responded: "You can take it home or leave it here, it's up to you."  The jury then left the courtroom.

After the jury left, the following colloquy occurred between Akpan's defense counsel, Robert Fickman, and the district court:

> Fickman: Your Honor, are they allowed to take the exhibit notebooks home with them?
> Court: They're copies.  Why not?  I let them take their notes home.  I let them take their minds home.  Why is that a problem?

---

[6]  Neither appellant challenges the district court's evidentiary rulings on the exhibits.

[7]  Doctors for Okoro's lead counsel, Richard Haynes, had scheduled emergency surgery for the afternoon of September 10, 2002 on a tumor in his hand.

10

Fickman: Well, I've never seen it before, I guess.

The record reflects that this colloquy occurred immediately after the jury left the room. Later, before the court recessed for the day, counsel for Akpan explicitly objected to the removal of the summary notebooks from the courtroom on the grounds that it (1) was prejudicial, (2) would encourage the jurors to discuss the evidence with others, and (3) would allow the jurors to deliberate before all evidence had been presented. The district court overruled the objection, stating that "I might have made them keep it if it had been done before it was an accomplished fact, but . . . ." The district court also informed counsel for Akpan that if he could think of a better reason, the court would not allow the jurors to remove the notebooks from the courtroom the following day. Okoro's defense counsel made no objection to the court's order even though three attorneys were present. Although Richard Haynes, lead counsel for Okoro, was in surgery, Sharon Levine, Paul Coselli, and Mike Durham, all counsel for Okoro, were present in the courtroom during the exchange.

The next day, Haynes and Fickman moved for a mistrial on the ground that the district court had allowed the jurors to leave the courtroom with the summary notebooks. The district court denied the motion and reminded defense counsel that the court had already admitted into evidence all of the notebook exhibits. Defense counsel then moved the district court to poll the jury to see

11

whether any of the jurors had actually left the courtroom with the summary notebooks. The district court denied the motion too.

The government argues that Fickman's colloquy with the district court after the jury left the courtroom amounts to neither a specific nor timely objection to preserve an abuse-of-discretion standard of review for the district court's denial of a mistrial. The government contends that we should review the district court's denial of a mistrial for plain error. We reject this argument.

The government appears to argue that because counsel for appellants did not object to the removal of the summary notebooks before the jury left the courtroom, they failed to preserve their objection to the district court's denial of a mistrial. This argument misconstrues the basis of appellants' assignment of error. Okoro and Akpan ultimately appeal the district court's <u>denial of their motion for a mistrial based on</u> its alleged error in allowing the jury to leave the courtroom with the summary notebooks. Under Federal Rule of Criminal Procedure 51, "[a] party may preserve a claim of error by informing the court — when the court ruling or order is made or sought — of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection."[8] On the day following the jurors' putative removal of the notebooks from the courtroom, Attorney Haynes specifically (and immediately) sought a mistrial, arguing

---

[8] FED. R. CRIM. P. 51(b).

12

that allowing the jurors to consider the summary notebooks outside of the courtroom prejudiced appellants because the books contained conclusions and allegations of the prosecution.  When Haynes and Fickman sought a mistrial for appellants, they followed Rule 51 precisely: They advised the district court of the action that they wished it to take and the grounds for that action.  The appellants preserved their objection to the denial of a mistrial for appeal, which we review for abuse of discretion.[9]

Akpan and Okoro do not challenge the government's use of summary notebooks.  Rather, they challenge whether the district court erred when it did not grant a mistrial on the grounds that one or more of the jurors may have left the courtroom with the summary notebooks.  The general rule in this circuit is that "no material either introduced in evidence or excluded from evidence

_____

[9]  We also note that the district court considered and treated Fickman's statements as objections.  When court reconvened the next day, the following colloquy occurred between Haynes and the district court:

> Mr. Haynes:  . . . in my absence yesterday I'm advised that Juror No. 2 . . . requested of the Court instructions as to whether or not the jurors could take home with them what's in evidence as Government's Exhibit 41DD, which is their summary of the conclusions and allegations and et cetera.  The Court apparently, over objection timely made by counsel for Defendant Akpan ——
> The Court: Actually before objection.
> Mr. Haynes: Sir?
> The Court: Before objection.
> Mr. Haynes: Before objections?
> The Court: The objection was made after the jury had left.

The record clearly reflects that the district court considered Fickman's colloquies as objections and specifically treated them as such the next day when lead counsel for Okoro moved for a mistrial.

13

should be in the possession of members of the jury outside of the courtroom."[10]  This is not, however, an immutable rule.  For example, in Rothstein, we ruled that the alleged possession of evidence by jurors outside of the courtroom amounted to harmless error because: (1) no misconduct was charged to anyone; (2) defense counsel admitted that it was no one's fault; (3) the jurors used the summaries on the day after they may have taken them home; and (4) there was no proof that any juror actually had possession of the summaries outside of the courtroom.[11]

The record supports a similar conclusion here.  First, the jurors used the summary notebooks throughout the trial with no further objection from appellants.  Second, appellants charge no one with misconduct and, indeed, there is no record evidence that any juror actually left the courthouse with a copy of the summary notebooks.[12]  Third, before the government distributed the summary notebooks, the district court had entertained and denied objections to the exhibits and admitted them into evidence.

This last finding — that the district court had already admitted all of the notebook exhibits into evidence — is central

_____

[10] United States v. Rothstein, 530 F.2d 1275, 1279 (5th Cir. 1976).

[11] See id.

[12] Although the district court denied appellants' motion to poll the jury, neither the record nor any evidence obtained later reflects that any one of them left the courtroom with the summary notebooks.  Indeed, only one juror asked if he could do so.

14

to our holding that the district court did not abuse its discretion in not granting a mistrial under these circumstances. Although we have found no case law directly on point, we recognize that other circuits that have considered objections to summary notebooks distinguish those instances when the exhibits in the notebooks have been admitted from those in which they have not.[13]

We are admittedly concerned with the district court's denial of appellants' motion to poll the jury, but we recognize that the court specifically admonished the jury — before allowing them to leave the courtroom with the summary notebooks — to keep an open mind about the evidence and not to arrive at a conclusion until

---

[13] In <u>United States v. Rana</u>, for example, where the defendant objected to the use of notebooks at trial, the Third Circuit held that "[t]he use of [a] notebook containing <u>still-to-be admitted</u> exhibits . . . conflicts with" a defendant's right to have an impartial jury base its verdict on properly admitted evidence 944 F.2d 123, 126-27 (3rd Cir. 1991) (emphasis added). In <u>United States v. Smith</u>, the defendant objected to the jury's use of summary notebooks at trial because they contained "four incomplete exhibits, four exhibits that were never admitted, and all the exhibits before they were admitted in evidence." 966 F.2d 1446, 1992 WL 137523, at *3 (4th Cir.) (unpublished disposition). The Fourth Circuit rejected the defendant's challenge because there was no evidence in the record that the jury had considered any of the exhibits before the district court admitted them. <u>See id.</u> Nor did the record support the defendant's claims that any juror noticed or studied the four exhibits that were never admitted. <u>See id.</u>

Lastly, in <u>United States v. Best</u>, the defendant challenged the jury's use of summary binders in the jury room during deliberations. 939 F.2d 425, 429 (7th Cir. 1991). The Seventh Circuit found no error in the jury's use of the binders because the district court had admitted into evidence all of the exhibits in them. <u>See id.</u> at 431. In addition, the district court there "verified, through individual voir dire of each juror, that the jurors considered all the evidence, not just the binders, in arriving at their verdict." <u>Id.</u>

15

they had heard all of the evidence.  As the district court itself noted, "[j]uries are presumed to follow the instructions of the court," and there is no indication here that the jurors did not do so.[14]

Akpan and Okoro appear to raise the same argument raised by the defendant in Best, which was rejected by the Seventh Circuit.[15] Appellants assert that the government's summary notebooks made it easier for the jury to follow the government's case, i.e., the summary notebooks served as a "road map" to the defendants' guilt. Thus, they urge, the district court should have granted a mistrial on this basis. Even were we to "accept the argument that the binders permitted greater access to the government's exhibits," it is unclear how "easy access by itself amounts to error."[16]  Although the summary notebooks here contained excerpts of exhibits one to forty-three, there is no record evidence that the jury did not have access to the originals.[17]

Again, neither Akpan nor Okoro challenge the admissibility of any of the exhibits contained in the government's summary notebooks, only the district court's refusal to grant a mistrial

---

[14] United States v. Fletcher, 121 F.3d 187, 197 (5th Cir. 1997) (citing Zafiro v. United States, 506 U.S. 534, 540-41 (1993)).

[15] 939 F.2d at 429.

[16] Id. at 430.

[17] See id. (noting that "the original exhibits, both the government and the defense documents, were carefully organized in boxes that were just as easily accessible to the jury.").

because one of the jurors <u>may</u> have taken home the notebook. Under the demanding abuse-of-discretion standard,[18] however, we will not reverse a district court unless "no reasonable person could take the trial court's adopted position."[19] We do not find the district court's ruling so erroneous that no reasonable person would have arrived at the same conclusion.

Furthermore, even if the district court had abused its discretion, such "abuse is only reversible i[f] the error affected a substantial right of the complaining party," i.e, we would subject the abuse to harmless error review, and conclude that if any error occurred here, it was harmless.[20] As noted, the district court had admitted into evidence all of the exhibits in the notebooks (to which appellants do not object), the jurors eventually saw each exhibit, and the district court did not allow the jurors to remove the summary notebooks from the courtroom after the appellants brought to its attention that they disagreed with the practice. If one juror happened to have taken his copy of the summary notebook one evening, doing so did not affect either appellant's substantial rights. We hold that the district court

---

[18] <u>See id</u>. (noting that although defendant objection to the presence of the binders in the jury room during deliberations, the proper standard of review was whether the district court abused its discretion when it failed to grant a new trial).

[19] <u>Whitehead v. Food Max of Miss., Inc.</u>, 332 F.3d 796, 803 (5th Cir. 2003).

[20] <u>Green v. Administrators of Tulane Educ. Fund</u>, 284 F.3d 642, 660 (5th Cir. 2002).

17

did not abuse its discretion when it denied Okoro and Akpan's motion for a mistrial.

We are nevertheless constrained to reiterate the general rule of this circuit that "no material either introduced in evidence or excluded from evidence should be in the possession of members of the jury outside of the courtroom."[21]  Appellants note, and we agree, that such a rule discourages jurors from deliberating outside of the jury room and from discussing evidence with those who are not part of the trial process.  The rule also keeps jurors from contemplating evidence before its admission. The context in which evidence is introduced is crucial to the weight that the jury potentially affords it.  Although we reiterate that this is not a bright-line rule, we caution any district court that considers making such an exception to the rule that adequate cautionary instructions and procedural safeguards must be present to ensure that an allowance of this kind does not so taint the trial process as to require a new trial.

**B. Sufficiency of the Evidence: Okoro**

Okoro also contends that the evidence adduced at trial was insufficient to support his convictions on counts seven and eight, which charged him with aiding and abetting mail fraud under 18 U.S.C. §§ 1341 and 2.  At the close of the government's evidence and at the end of trial, both Okoro and Akpan moved for a judgment

---

[21] <u>Rothstein</u>, 530 F.2d at 1279.

18

of acquittal under Federal Rule of Criminal Procedure 29 with regard to all counts. Okoro expressly sought a judgment of acquittal on counts seven and eight.

We review a denial of a motion for judgment of acquittal de novo.[22] We "review[] jury verdicts with great deference and evaluate[] the evidence in the light most favorable to the verdict and afford the government the benefit of all reasonable inferences and credibility choices."[23] When treating a challenge to the sufficiency of the evidence to sustain a conviction, we consider "'whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.'"[24] "All reasonable inferences from the evidence must be construed in favor of the jury verdict."[25] We will not "supplant the jury's determination of credibility with . . . [our] own."[26]

To prove a mail fraud violation under Section 1341, the government must establish: "(1) a scheme to defraud; (2) use of the

---

[22] United States v. McCauley, 253 F.3d 815, 818 (5th Cir. 2001).

[23] Id. (quoting United States v. Odiodio, 244 F.3d 398, 400-02 (5th Cir. 2001)) (quotations omitted).

[24] Id. (quoting United States c. De Leon, 170 F.3d 494, 496 (5th Cir. 1999)).

[25] United States v. Martinez, 975 F.2d 159, 161 (5th Cir. 1992).

[26] Id.

19

mails to execute the scheme; and (3) the specific intent to defraud."[27] "Each separate use of the mails to further a scheme to defraud is a separate offense."[28] The government need not establish that the defendant used the mails himself or that he actually intended that the mails be used.[29] The government need only prove that the scheme depended for its success in some way upon the information and documents which passed through the mail.[30] Further, a defendant acts with the intent to defraud when he "acts knowingly with the specific intent to deceive for the purpose of causing pecuniary 'loss to another or bringing about some financial gain to himself.'"[31]

To obtain a conviction for aiding and abetting under 18 U.S.C. § 2, the government must prove "that the defendant associated with a criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful."[32] A defendant associates with a criminal venture when

---

[27] United States v. Floyd, 343 F.3d 363, 371 (5th Cir. 2003); United States v. Tencer, 107 F.3d 1120, 1125 (5th Cir. 1997).

[28] United States v. Pazos, 24 F.3d 660, 665 (5th Cir. 1994) (citing United States v. McClelland, 868 F.2d 704, 706 (5th Cir. 1989)).

[29] Id.

[30] See id.

[31] United States v. Blocker, 104 F.3d 720, 732 (5th Cir. 1997) (quoting United States v. Jimenez, 77 F.3d 95, 97 (5th Cir. 1996)).

[32] Id. at 733 (citing United States v. Polk, 56 F.3d 613, 620 (5th Cir, 1995).

20

he "shares in the criminal intent of the principal."[33]     To establish that the defendant participated in the criminal activity, the government must prove that "he has acted in some affirmative manner to aid the venture."[34]  "Mere presence and association are insufficient to sustain a conviction for aiding and abetting."[35]

Counts seven and eight charged Okoro with the receipt — by mail — of funds from USAA for medical services that he did not render to Audrey Santos.  Okoro argues that the evidence adduced at trial was insufficient to uphold his conviction because Santos never testified.  Santos's boyfriend, Minh Nguyen, testified at trial with regard to the treatment that both he and Santos received.  In sum, Okoro argues that Nguyen's testimony alone is insufficient to sustain his conviction.  Thus, he urges, the government failed to prove that he falsely represented to USAA the medical services that he rendered to Santos.  We reject this argument.

Nguyen testified that he and Santos went to MedCare on the advice of their attorney after they were injured in an automobile accident.  The same man examined both him and Santos.  Guadalupe Castro ("Lupy") then took them to adjacent rooms, placed them on therapy beds, and set the timers.  Although Nguyen testified that

---

[33] Id. (citing United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995)).

[34] Id.

[35] Id.

he never witnessed a doctor examine Santos, he also stated that he would have been aware if she had received any treatment on her therapy bed because her treatment room was immediately adjacent to his. Nguyen testified that he and Santos could converse with each other from the adjacent rooms. Moreover, Nguyen stated that they attended other therapy sessions at Medcare together, and that on the one occasion when Santos attended a session alone, he drove her there.

Nguyen further testified that in each others' presence, Lupy instructed the two of them to sign the blank sign-in sheets, and they did so. Nguyen also stated that he saw Santos fill out the forms and that each of them signed forms for dates on which they did not visit the clinic. Nguyen also identified the MedCare bills that each received, testifying that each bill noted that the patient had received treatments that he or she had not. And, USAA mailed the settlement checks to Nguyen's and Santos's attorney, who, in turn, paid both patients.

The record belies Okoro's contention that the government relied solely on Nguyen's testimony to sustain counts seven and eight. At trial, Dr. Vachhani identified Okoro's signature on the progress notes in Nguyen's patient file, and on the medical summary, the progress notes, and the narrative in Santos's file. Nguyen stated that Okoro never examined either him or Santos. Indeed, Okoro himself testified that he never treated either patient.

22

Other evidence adduced at trial established that Okoro and the other clinic employees followed this pattern with all the patients named by the government in counts one through four and nine through fifteen of the second superceding indictment, including Nguyen himself.  The jury was entitled to rely on all of the other evidence and testimony to determine whether a scheme to defraud existed and whether Okoro followed that scheme with regard to Santos.[36]  The evidence was sufficient for a jury to conclude that Okoro falsely reported medical services that he rendered Santos when he had not —— medical services that were subsequently billed via mail to USAA.  We hold that the evidence was sufficient to support Okoro's convictions on counts seven and eight.

C.    **Sufficiency of the Evidence: Akpan**

Akpan also argues that the evidence was insufficient to convict him of aiding and abetting mail fraud in violation of Sections 1341 and 2.  Count one of the second superceding indictment charged Akpan with aiding and abetting such mail fraud by receiving inflated insurance payments from USAA for treatment that Agents Tucker and Jefferson allegedly received.  Akpan argues that the evidence is insufficient to uphold his conviction on count one, because the government relied solely on an audiotape of a

---

[36] See, e.g., Tencer, 107 F.3d at 1127-28 (noting that even though patient charged in indictment did not testify at trial with regard to fraudulent services, jury was entitled to rely on circumstantial evidence in form of testimony of other patients with regard to whether claims submitted to insurance company were fraudulent).

23

conversation between him and the two undercover agents. Akpan advances that the audiotape is unintelligible and does not demonstrate that he stood to derive any financial benefit from Tucker's or Jefferson's cases. In sum, Akpan maintains that the audiotape merely demonstrates that he performed his job as the clinic administrator.

Contrary to Akpan's argument, the government did not rely solely on the audiotape. Thus, his reliance on an allegedly unintelligible audiotape is meritless. Agent Tucker herself testified in detail at trial as to her interaction with Akpan. Her testimony revealed that Claudia Ramon was in the room during the conversations with Akpan, that Akpan had Tucker's and King's files with him, and that he returned them to Ramon when the conversation ended. Tucker also testified that after she, Ramon, and King left Akpan's office, Ramon provided them with the dates to fill in on their patient files.

Further, as noted, to conclude that Akpan participated in a scheme to defraud, the jury was entitled to rely on "circumstantial evidence and by inferences drawn from the facts and circumstances surrounding the scheme."[37] Although the district court agreed to give a limiting instruction to the jury regarding which witnesses and evidence it could consider during deliberations on count one (the sole count that charged Akpan with mail fraud), even Akpan's

---

[37] United States v. O'Brien, 119 F.3d 523, 532 (7th Cir. 1997).

24

counsel conceded that other witness testimony could establish a common scheme or plan.

The government established that Akpan and Okoro had an ongoing business relationship. They had worked together at Westchase and Spectrum Clinics before they transferred to MedCare. In addition, Akpan owned one of the clinics for which Okoro worked as a provider. Most importantly, the evidence at trial established that at both Spectrum and MedCare, Akpan was the administrator who supervised the office staff and worked with the lawyers and insurance companies to ensure that the clinic received its share of the settlement funds for the services rendered to the car accident "victims." Akpan thus supervised the key activity of the mail fraud scheme —— the mailing of letters to the insurance companies and the attorneys to ensure that they paid the clinic and, in turn, the receipt of such funds through the mails. The audiotape, containing the most damning evidence, viz., Akpan's insistence that the clinic receive its money (because, as he alleged, many patients denied receiving services as many times as their record demonstrated), further bolstered the government's allegation of a common scheme or plan. The record demonstrates sufficient evidence to sustain Akpan's conviction on count one.

### D. Rule 404(b) Evidence

Okoro maintains that the district court committed reversible error when it admitted extrinsic evidence of his involvement with

25

seventeen home health care agencies in support of the health care fraud charges in counts twenty through twenty-six of the second superceding indictment. Okoro first contends that the government failed to provide him with notice before trial of its intent to use Rule 404(b) evidence. Okoro argues in the alternative that the evidence does not pass Rule 404(b)'s admissibility test.

Generally, we review a trial court's decision to admit evidence for abuse of discretion.[38] As Okoro did not object to the admissibility of the evidence until his motion for a new trial, we review the district court's decision for plain error only.[39] Also, Okoro raises for the first time on appeal the issue whether he properly received notice of the government's intent to use the specific acts evidence. Accordingly, we also review this objection for plain error.[40]

Okoro's contention that Rule 404(b) applies here is off the mark. Okoro forfeited the protection of Rule 404(b) when he placed his character at issue by testifying at trial.[41] Although this "does not give the prosecution free rein," it allows the

---

[38] United States v. Riggio, 70 F.3d 336, 339 (5th Cir. 1995).

[39] United States v. Smith, 203 F.3d 884, 890 (5th Cir. 2000) ("However, if a defendant fails to object at trial, this Court will only review evidentiary rulings for plain error.").

[40] Id.

[41] United States v. Mikolajczyk, 137 F.3d 237, 244 (5th Cir. 1998) (citing United States v. Tomblin, 46 F.3d 1369, 1388 (5th Cir. 1995)) ("A defendant makes his character an issue, losing the protection of rule 404(b), when he testifies.").

26

government, under Federal Rule of Evidence 608(b), to cross-examine the defendant "with respect to instances of misconduct that are clearly probative of truthfulness or untruthfulness, such as perjury, fraud, swindling, forgery, bribery, and embezzlement."[42] Because the government offered the other-acts evidence to impeach Okoro on cross-examination while he was on the stand so as "to show the character of the witness for untruthfulness," Rule 404(b)'s notice provision and its two-part admissibility test do not apply here.[43]

The government's evidence pertained directly to Okoro's character for truthfulness or the lack thereof.  Okoro insisted on direct examination that he did not enter into a scheme to defraud Medicare.  He testified that he did not authorize the home healthcare clinics to bill Medicare under his provider number for services that he himself did not render.  Okoro stated that he had regularly treated patients in nursing or halfway homes from 1996 until 1999, but that he did not charge for these services and did not receive many payments for services that he did provide.

On cross-examination, the government demonstrated that, to the contrary, seventeen home healthcare providers had charged Medicare

---

[42] Id. (quotations omitted); see also Bustamente, 45 F.3d at 945-46 ("FRE 608(b) allows the government to inquire into specific instances of conduct relevant to Bustamente's character for truthfulness.").

[43] Tomblin, 46 F.3d at 1388 & n. 51 (quoting United States v. Schwab, 886 F.2d 509, 511 (2d Cir. 1989)).

almost two million dollars for Okoro's services.  Of this two million dollars, the home healthcare providers paid Okoro $15,000 in "consulting fees."  This evidence directly contradicted Okoro's testimony that the home healthcare providers did not pay him.  The district court did not abuse its discretion in admitting this evidence under Rule 608(b).

### E.    Admissibility of Witness Testimony

Okoro informed the district court that he intended to call three groups of witnesses: (1) personal injury attorneys who had represented car accident victims named in the indictment, which attorneys would testify that their clients were satisfied with the services Okoro had rendered and who never questioned the amount of money that the insurance companies paid; (2) former patients of Okoro not named in the indictment who would testify that they were satisfied with Okoro's services; and (3) owners of physical therapy clinics who would rebut the allegations that Okoro billed them for services that he did not perform.  Okoro argues that the district court severely limited his right to call these witnesses, contending that the district court excluded testimony of Okoro's former patients and the owners of the medical clinics.  We review a district court's rulings on the admissibility of the testimony of a witness for abuse of discretion.[44]

---

[44] United States v. Gray, 105 F.3d 956 (5th Cir. 1997).

28

The government first argues that Okoro made no proffer with regard to the testimony of the witnesses who he intended to call. Federal Rule of Evidence 103 states that no "[e]rror may be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."[45] We have held that a defendant will preserve his challenge to excluded evidence if "'the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted, and this court has a record upon which [it] may adequately examine the propriety and harmfulness of the ruling.'"[46] We will not review a challenge to excluded evidence, however, unless the defendant made an offer of proof at trial.[47] We reject the government's contention on this point because the record reflects that Okoro's counsel held a lengthy discussion with the district court in which he informed the court about the testimony of the witnesses that he intended to call.

Contrary to Okoro's argument, however, the district court did not <u>exclude</u> these witnesses. Okoro called four patients who

---

[45] FED. R. EVID. 103(a) & (a)(2).

[46] <u>United States v. Jimenez</u>, 256 F.3d 330, 343 (5th Cir. 2001)(quoting <u>United States v. Ballis</u>, 28 F.3d 1399, 1406 (5th Cir. 1994)).

[47] <u>United States v. Winkle</u>, 587 F.2d 705, 708 (5th Cir. 1979).

testified to their relationship with Okoro and that they were satisfied with Okoro's services. Although the district court limited Okoro's former patients' testimony and stated that they could not testify with regard to billing matters because the indictment did not name these patients, Okoro did not object to this ruling or attempt to proffer the testimony of other patients after the four testified.

Further, the following colloquy occurred when Okoro mentioned the third set of witnesses — the clinic owners:

> Mr. Haynes: Well, that would be what we would want the clinic people to say and that is, one, they had the agreement with [Okoro], two, that he was salary or actual hours there, three that he came by when he told then he would be scheduled to come by and that when he did come by, he performed evaluations on the patients for whom they gave bills to the insurance company and/or Medicare.
> The Court: Well, now, that's three things, all of which that's fine.

The district court then stated that it would allow the clinic owners to testify as to the custom or practice of the clinic at the times that Okoro was there. Okoro did not object at trial that this testimony would be too limited; in fact, he called one clinic owner to the stand. After that clinic owner's testimony, counsel for Okoro informed the district court that he would let everyone know after lunch whether he would call another owner to the stand. After lunch, however, counsel for Okoro made no further mention about calling another clinic owner. Okoro's objections are without merit. We find no error here.

**F.   Okoro's Sentence**

Okoro asserts several challenges to his sentence. Specifically, he contends that under <u>United States v. Booker</u>,[48] the district court erred when it calculated the amount of loss attributable to him under United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1.[49] Okoro also challenges the district court's application of U.S.S.G. § 2F1.1(b)(8)(B), pursuant to which the district court enhanced Okoro's base offense level by four levels because he had deprived one or more financial institutions of more than one million dollars. In his supplemental Rule 28(j) letter to this court, Okoro also challenges the district court's enhancement of his base offense level by: (1) four levels for being a leader/organizer of the criminal activity; (2) two levels for more than minimal planning; and (3) two levels for abuse of his position of trust.[50]

---

[48] —— U.S. ——, 125 S. Ct. 738 (Jan. 12, 2005).

After the Supreme Court handed down <u>Blakely v. Washington</u>, —— U.S. ——, 124 S. Ct. 2531, both appellants raised <u>Blakely</u> challenges to their sentences in a Rule 28(j) letter to this court. When the Supreme Court decided <u>Booker</u>, we ordered the parties to brief its effect on their sentences. Thus, because <u>Booker</u> specifically applies to the U.S.S.G., we refer to each appellant's challenge to his sentence as a <u>Booker</u> challenge.

[49] The district court increased Okoro's base offense level by 14 levels based on a total loss of between five and ten million dollars. The indictment alleged a total loss of $75,408.47.

[50] Okoro also contends that the district court erred when it specified that his 31-month sentence for tax fraud should run consecutively to his 120-month sentence for mail and healthcare fraud. As we remand for resentencing in light of <u>Booker</u>, we need not and therefore do not reach this challenge.

31

The Supreme Court made clear in Booker that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to the jury beyond a reasonable doubt."[51] The government argues that Okoro has not properly preserved his Booker objection and that we should review Okoro's challenge for plain error.[52] Okoro did not, however, fail to preserve his Booker challenge to the district court's loss calculation. Our review of Okoro's pre-sentencing objections to the Presentence Investigation Report ("PSR") and his objections during his sentencing reveal that Okoro repeatedly objected to the district court's determination of a range of financial loss between five and ten million dollars on the ground that that figure had not been proven at trial. Okoro also consistently urged that the district court confine its determination of loss to the amount alleged in the indictment. Although Okoro never explicitly mentioned the Sixth Amendment, Apprendi, or Blakely until his Rule 28(j) letter, we are satisfied that his objections adequately apprised the district court that Okoro was raising a Sixth Amendment objection to the loss calculation because the government did not prove to the jury beyond a reasonable doubt that the loss was between five to ten million

---

[51] 123 S.Ct. at 756.

[52] See United States v. Mares, — F.3d —, 2005 WL 503715, at *7-8 (5th Cir. Mar. 4, 2005).

dollars.[53]  When, as here, a defendant preserves his error, "we will ordinarily vacate the sentence and remand, unless we can say the error is harmless under Rule 52(a) of the Federal Rules of Criminal Procedure."[54]

We recognize that several circuit courts appear to be taking divergent positions on the question whether a harmless error analysis applies when a Sixth Amendment violation occurs.[55]  Were

---

[53] See, e.g., United States v. Selwyn, 398 F.3d 1064, 1066-67 (8th Cir. 2005) (noting, in case involving Sixth Amendment violation, that defendant preserved error by objecting to drug quantity findings); United States v. Fox, 396 F.3d 1018, 1027 (8th Cir. 2005) (noting, in case involving Sixth Amendment violation, that Booker objection to drug quantity finding in supplemental pro se brief preserved error).
We recognize, as have other circuits, that there exists some question "whether, in cases not involving a Sixth Amendment violation, there must be an objection to the mandatory nature of the guidelines in order to preserve that error on appeal, or whether a general objection to the sentence imposed under the guidelines is sufficient to preserve a Booker challenge."  United States v. Sayre, —— F.3d ——, 2005 WL 544819, at * 1 (8th Cir. Mar. 9, 2005).  Because a pure Booker Sixth Amendment violation occurred here, however, we need not —— and do not —— resolve this debate.

[54] Mares, 2005 WL 503715, at *7 n. 9.

[55] For example, the Sixth Circuit seems to intimate that a harmless error analysis is not required when a constitutional violation occurs.  See, e.g., United States v. Oliver, 397 F.3d 369, 381 (6th Cir. 2005) (noting in a case where defendant failed to preserve error that "[h]aving concluded that the district court's sentencing determinations in this case plainly violate the Sixth Amendment, we need not consider whether such an error is harmless.").  The Sixth Circuit's position finds support in the last sentence of the remedial Booker opinion. —— U.S. at ——, 125 S. Ct. at 769 ("It is also because, in cases not involving a Sixth Amendment violation, whether resentencing is warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine.").
On the other hand, the District of Columbia Circuit appears to

33

we to review Okoro's sentence for harmless error, however, we would find that here the error was harmful.[56]  Harmless error is "[a]ny defect, irregularity, or variance that does not affect substantial rights" of the defendant,[57] and "arises when the mistake fails to prejudice the defendant."[58]  "Prejudice occurs when the error 'ha[s] affected the outcome of the district court proceedings.'"[59]  The government must bear the burden of demonstrating that the error was harmless[60] by demonstrating beyond a reasonable doubt that the federal constitutional error of which a defendant complains did not contribute to the sentence that he received.[61]

The government cannot meet this burden here.  It can point to no record evidence that would prove beyond a reasonable doubt that the district court would not have sentenced Okoro differently had it acted under an advisory Guidelines regime.  Based on the record before us, we cannot say that the mandatory nature of the

---

assume that <u>Booker</u> challenges are "governed by the harmless error standard appropriate for constitutional error . . . ."  <u>United States v. Coumaris</u>, ⸺ F.3d ⸺, 2005 WL 525213, at *6 (D.C. Cir. Mar. 8, 2005).

[56] <u>Mares</u>, 2005 WL 503715, at *7 n. 9.

[57] FED. R. CRIM. P. 52(a).

[58] <u>United States v. Munoz</u>, 150 F.3d 401, 413 (5th Cir. 1998) (citing <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993)).

[59] <u>Id.</u>

[60] <u>See id.</u>

[61] <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).

34

Guidelines at the time of Okoro's sentence did not contribute to the sentence that he received. Accordingly, we vacate Okoro's sentence and remand for resentencing.[62]

### G. Akpan's Sentence

Akpan also challenges his sentence on <u>Booker</u> grounds. Specifically, Akpan argues that the district court violated <u>Booker</u> when it calculated the loss and increased his sentence based on an amount of loss not found by the jury nor admitted by him. Akpan also argues that the district court violated his right to trial by jury when it increased his base offense level by two levels for more than minimal planning and by three levels for a leadership role in the offense. The government counters that Akpan has not preserved his <u>Booker</u> challenge as he raised it for the first time on appeal. Our review of the record demonstrates that this contention is accurate. Akpan did not couch his arguments in the district court as to the loss calculation in the same terms as Okoro. Thus, we review Akpan's sentence for plain error.[63]

Under the plain error test, we may not correct an error that the defendant has failed to preserve unless there is "(1) error,

---

[62] Because we vacate and remand Okoro's entire sentence, we need not and do not reach his other arguments of sentencing errors; rather, we leave to the discretion of the district court, whether in its discretion, it will impose the identical sentence with the identical departures or enhancements, or both.

[63] <u>Mares</u>, 2005 WL 503715, at *7-8.

35

(2) that is plain, and (3) that affects substantial rights."[64] Even if the defendant carries his burden as to these three factors, however, we will not correct the error unless "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[65]

Under Mares, Akpan passes the first two requirements for plain error,[66] but he fails the third. To demonstrate that the error affected his substantial rights, Akpan had to show that the error affected the outcome of the district court proceedings.[67] Thus, the defendant, rather than the government, bears the burden here.[68] Akpan must "demonstrate a probability 'sufficient to undermine confidence in the outcome.'"[69]

Under Mares, Akpan cannot satisfy his burden. He cannot demonstrate that the district judge — sentencing under an advisory rather than a mandatory Guidelines regime — would have sentenced him differently.[70] The record does not contain anything to reflect

---

[64] United States v. Cotton, 535 U.S. 625, 631 (2002).

[65] Id.

[66] 2005 WL 503715, at *8.

[67] See id. (quoting United States v. Olano, 507 U.S. 725, 734 (1993)).

[68] Olano, 507 U.S. at 734.

[69] United States v. Dominguez-Benitez, — U.S. —, 124 S. Ct. 2333, 2340 (2004).

[70] Mares, 2005 WL 503715, at *9.

what the district court would have done had it sentenced Akpan under an advisory Guidelines regime. The district court made no remarks on the record to indicate that (1) it was bound by the Guidelines, (2) it felt constrained by the Guidelines to sentence Akpan in the way that it did, or (3) it would have sentenced him differently if it had had the discretion to do so. In the total absence of any such language, Akpan cannot carry his burden on the third prong of the plain-error test.

Akpan also contends that the district court erred when it did not state the reasons for imposing his particular sentence under 18 U.S.C. § 3553(c)(1). As Akpan failed to object to the district court's failure to state its reasons for imposing his particular sentence, our review is again for plain error.[71]

Under 18 U.S.C. § 3553(c), "[i]f a defendant's guidelines sentencing range exceeds twenty-four months, the district court must state in open court its reasons for the particular sentence that it has imposed."[72] Akpan argues that the district court failed to state its reasons in open court for imposing a 41-month sentence as to Count One.

Based on a total offense level of 21 and a criminal history category of I, the district court determined that Akpan's guideline range was between 37 to 46 months imprisonment. "Although 18

---

[71] United States v. James, 46 F.3d 407, 407-08 (5th Cir. 1995).

[72] Id. at 407 (citing 18 U.S.C. § 3553(c)(1)).

37

U.S.C. § 3553(c) requires the sentencing judge to state in open court the reasons for its imposition of the particular sentence . . . the district court need not provide reasons for imposing a sentence at a particular point within the [applicable Guidelines range] if this range is less than twenty-four months."[73] Here, Akpan's guideline range did not span a range of twenty-four months. His argument is therefore without merit. We affirm Akpan's sentence.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM both Okoro's and Akpan's convictions, as well as Akpan's sentence. In light of Okoro's preservation of Sixth Amendment error, however, we VACATE his sentence and remand for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

[73] United States v. Pippin, 903 F.2d 1478, 1484-85 (11th Cir. 1990) (citations and quotations omitted). See also United States v. Richardson, 925 F.2d 112, 117 (5th Cir. 1991) ("Following the reasoning in United States v. Ehret, 885 F.2d 441 (8th Cir. 1989), cert. denied, 493 U.S. 1062 110 S. Ct. 879, 107 L. Ed.2d 962 (1990), we find that when the spread of an applicable Guideline range is less than 24 months, the district court is not required to state its reasons for imposing a sentence at a particular point within the Guideline range.").