United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 16, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

No. 05-20746

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CHIJIOKE VICTOR OKORO, also known as Victor Okoro, also known as
Chiji V. Okoro

Defendant-Appellant.

---

Appeal from the United States District Court
For the Southern District of Texas

---

(4:01-CR-399-01)

---

Before BARKSDALE, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Chijioke Victor Okoro ("Okoro") appeals the district court's
sentence for his mail fraud, healthcare fraud, and tax fraud
convictions. Okoro claims several points of error: (1) that his
post-*Booker* sentence was not "reasonable"; (2) that the district
court erred by sentencing him based on facts not found by a jury or
admitted by him; (3) that the district court erred in calculating

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5th Cir. R. 47.5.4.

the loss attributable to him; and (4) that the district court erred by imposing consecutive sentences on his tax fraud and healthcare fraud convictions. For the reasons stated below, we affirm.

I.

This Court previously has had the opportunity to discuss the factual background of this case at some length in *United States v. Akpan*, 407 F.3d 360, 362-65 (5th Cir. 2005). We quote from that well-written opinion:

> Doctor Okoro is a native of Nigeria who came to the United States to attend college in the 1970s. He received an undergraduate degree in chemistry and graduated from medical school. As a licensed physician, Okoro practiced medicine in the United States from 1981 until 2002. He also developed a medical missionary program to bring medical care to his native Nigeria. Between 1984 and 2000, Okoro traveled to Nigeria twice a year to provide medical care to impoverished Nigerians. In 1989, Okoro moved to Houston, Texas to work as an emergency room doctor at Memorial Hospital Northwest ("Memorial"). In 1990, Memorial promoted him to the Director of the Emergency Department, a position that he held until his arrest. In 1999, Okoro became a United States citizen.

> A. Mail Fraud

> Okoro also worked for the Westchase Clinic ("Westchase") until it closed in 1995, when he began work for Westchase's successor, Spectrum Medical Clinic ("Spectrum"). Okoro and Akpan worked together at both Westchase and Spectrum. In 1996, Spectrum was dissolved and became Houston Medcare ("Medcare"), a minor injury clinic owned by Okoro. Many of Spectrum's employees joined Okoro at Medcare. Most importantly, Okoro hired Akpan as Medcare's administrator to work with lawyers and insurance company representatives to ensure that the clinic received payment for the services that it rendered. Akpan coordinated the transfer of patients from Spectrum to Medcare and also supervised Spectrum's office staff.

2

In March 1996, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), and the United States Department of Health and Human Services ("DHHS") began to investigate attorneys and physicians suspected of submitting false claims to insurance companies for non-existent medical services purportedly provided to victims of motor vehicle accidents. The results of the undercover investigation by FBI Special Agent Lorraine Tucker and Houston Police Officer Sheryl Jefferson reveals the fraudulent scheme alleged by the government in the indictment against Okoro and Akpan.

Tucker (posing as "Lorraine Bell") and Jefferson (posing as "Sheryl King") took out insurance policies under their aliases in cooperation with representatives of the United Services Automobile Association ("USAA"). FN3 They then filed a fictitious accident report that listed Jefferson as the driver.

> FN3. For ease of comprehension, we refer to Tucker and Jefferson by their real names.

Tucker received a phone call on her undercover telephone from an individual who identified herself as Cindy Halla, allegedly a representative of a Christian organization called Sisters of Grace. Halla informed Tucker that the Sisters of Grace provided transportation and referrals for victims of car accidents. Halla's associate, Walter Oji, picked up Tucker at her undercover apartment and took her to Spectrum, which was then still in operation. Tucker wore a hidden recording device during this first visit to Spectrum. When they arrived at the clinic, a Spectrum employee gave Tucker some paperwork to complete. She filled it out and gave it to Oji, who then gave it to the receptionist.

Claudia Ramon, a Spectrum nurse, led Tucker to the back of the clinic, where Ramon recorded Tucker's height, weight, and blood pressure and told her that a doctor would be in to see her shortly. Dr. Sunil Vachhani, a licensed chiropractor employed by Okoro, examined Tucker. She informed him that her right shoulder hurt. Dr. Vachhani recommended that Tucker receive physical therapy, but she received none during her first visit. After Dr. Vachhani examined Tucker, Oji took her to the law offices of Gabriel Giwa, whom she retained to recover payment from USAA for the injuries that she had received

3

in the purported car accident.

Oji again transported Tucker to Spectrum in late March 1996. Tucker asked Oji if she should sign in for Jefferson as well, and Oji informed her that she could if she wanted. Tucker wrote both of their undercover names on the sign-in sheet. Ramon led Tucker to an examination room, where she handed Tucker a sheet of yellow paper that contained multiple dates. Ramon asked Tucker to record the dates in her patient file. Tucker then signed the daily sign-in sheets for the month of March, as well as the daily sign-in sheets for all of the days listed on the yellow paper.

Tucker told Ramon that her roommate Jefferson had been in the same accident but that Jefferson was out of town. Ramon told Tucker that she would speak to her superior about Jefferson. Ramon then introduced Tucker to Akpan, to whom Tucker spoke about Jefferson. Akpan told her that "he would work something out" and would contact their attorney.

In April 1996, Tucker returned to Spectrum by herself. She signed in as usual, and Ramon again gave her a sheet of paper that contained multiple dates. Tucker recorded the dates into her patient file and signed her name on the corresponding daily sign-in sheets. Ramon told Tucker to bring Jefferson with her on her next visit.

On May 1 and 9, 1996, Tucker returned to Spectrum with Jefferson. During the May 9 visit, Tucker and Jefferson met with Akpan. When he asked Jefferson why she had not visited Spectrum earlier, she explained that she had been out of town. Akpan told them that he would help them but that they should not tell others, explaining that car accident lawsuits often settled and that problems arose when the lawyers distributed the settlement funds. Akpan also told them that patients often denied the amount of services that they received at the clinic to avoid payment. Akpan explained that he would get his money and asked if they "were all together on that." Tucker and Jefferson assured him that they were. At the close of the meeting, Ramon provided both Tucker and Jefferson with more sign-in sheets for multiple future dates, which they signed.

Spectrum ultimately billed USAA $1550 for services rendered to Tucker, claiming 27 physical therapy treatments from March 20 to May 9, 1996. Spectrum also

4

billed USAA $3190 for Jefferson's medical treatment, also for 27 visits between March 20 and May 9, 1996, with multiple treatments rendered on the same day. Okoro's signature appeared on much of the paperwork, even though Okoro had never examined either Tucker or Jefferson. In fact, neither Tucker nor Jefferson had ever even met Okoro.

The "sign-in" scheme was replicated with many of the clinic's patients-Minh Nguyen, Audrey Santos, Simon Mosongo, Yolanda Coleman, Rebecca Whitfield, Dexter Hall, Iyomo Louison, Lora Goree, Halane Dunn, and Manuel Roth. Although some of the patients received physical therapy treatments and some were examined by Okoro, each patient signed blank sign-in sheets and blank patient forms. In addition, Okoro signed most of the forms himself, yet many of the patients testified that he had never examined them, and the evidence at trial demonstrated that he was out of the country-in Nigeria-during many of their "visits."

## B. Healthcare FraudFN4

FN4. Okoro does not appeal his conviction for tax fraud.

Okoro also worked with 21 other physical therapy clinics. Medicare issues a group number to each health care facility and an individual provider number to physicians within the facility. Physicians must complete a "reassignment of benefits" application to allow the facility to bill Medicare for the physician's services. Medicare then reimburses the facility under the physician's provider number. The facility may bill Medicare for services that the physician renders only when he is present.

Between 1998 and 2000, Okoro received individual provider numbers in connection with 21 physical therapy clinics. These clinics were owned by Akpan, Sekibo Williams, a foreign medical student who worked at Medcare, and Henry Johnson, Spectrum's previous owner. In total, the clinics billed Medicare $9,788,724.76, and Medicare paid a total amount of $4,192,544.16 to the clinics. Of this amount, Okoro received $324,373.87 from the clinics between 1999 and 2001.

5

The evidence at trial demonstrated that many of the physical therapy clinics billed Medicare for services that Okoro allegedly rendered after he deactivated his individual provider number for that clinic. In addition, Okoro signed patient documents that stated that he had treated those patients on specific dates and at specific times on which Okoro could not possibly have rendered services. For example, many of the dates on which Okoro alleged that he provided services were dates when he was in Nigeria.

*Id.*

In February 2002, a grand jury indicted Okoro on fifteen counts of aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342; three counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1); and seven counts of healthcare fraud, in violation of 18 U.S.C. § 1347. Following trial, a jury found Okoro guilty on all counts.

Prior to the issuance of *United States v. Booker*, 543 U.S. 220 (2005), the district court sentenced Okoro to 151 months in prison: 120 months for the healthcare fraud counts, 31 months (consecutive) for the tax fraud counts, and 60 months (concurrent) for the mail fraud counts.[2] The 151-month sentence was the highest allowed under the Guidelines.

Okoro appealed his conviction and sentence and this Court upheld the conviction but remanded the pre-*Booker* sentence because the Government could not prove that the sentence would have been the same under a non-mandatory Guideline regime. *Akpan*, 407 F.3d at

---

[2]Sixty months was the statutory maximum penalty for violations of 18 U.S.C. § 1341 in 2000.

377. At re-sentencing, the district court imposed the same 151-month sentence and Okoro timely appealed to this Court.

II.

A.

After *Booker*, we ultimately review sentences for reasonableness. *See Booker*, 543 U.S. at 261-62; *United States v. Smith*, 440 F.3d 704, 706 (5th Cir. 2006). We review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error. *Smith*, 440 F.3d at 706; *United States v. Villanueva*, 408 F.3d 193, 203 n.9 (5th Cir.), *cert. denied*, 126 S. Ct. 268 (2005).

*Booker* mandates that sentencing courts consider the factors set forth in 18 U.S.C. § 3553(a), and we review the court's application of those factors in determining whether a sentence is reasonable. *See United States v. Mares*, 402 F.3d 511, 518-19 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005). Section 3553(a) requires the district court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other

7

        correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) [the relevant Guideline range];

    (5) any pertinent policy statement--
        (A) issued by the Sentencing Commission . . . .;

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Okoro claims that the district court erred by failing to consider his "history and characteristics" as required by § 3553(a)(1), and therefore, his sentence is unreasonable. In particular, Okoro argues that the court refused to consider his "valuable charitable contributions to society through his legitimate medical practice and through his [medical] missionary work to impoverished Nigerians." Okoro points out this Court previously acknowledged his medical career in Houston and his travels to Nigeria to provide medical care. *Akpan*, 407 F.3d at 363.

However, even a cursory review of the sentencing transcript reveals that the district court considered Okoro's history and characteristics. The transcript indicates the court examined Okoro's alleged charitable medical work in Nigeria and ruled that it was a fraud. The court noted that Okoro continued to bill Medicare and insurance companies for patients he falsely claimed to

8

have treated in Houston during his trips, and that the government (through Medicare) and the medically insured (through their insurance premiums) were paying for Okoro's trips to Nigeria.

By refusing to credit Okoro with his alleged charity work, the district court has made a credibility determination to which this Court gives deference. *See United States v. Perez*, 217 F.3d 323, 331-32 (5th Cir. 2000). Further, in imposing a Guideline sentence,[3] the district court is presumed to have considered the § 3553 factors, and the sentence itself is entitled to a presumption of reasonableness. *Mares*, 402 F.3d at 519-20; *United States v. Alonzo*, 435 F.3d 551, 553-54 (5th Cir. 2005). Okoro has failed to rebut this presumption and we find that the sentence was reasonable.

B.

In considering Okoro's other claimed points of error, we find no errors under the applicable standards of review. Therefore, we affirm.

**AFFIRMED.**

---

[3]Okoro contends that his sentence is a "non-Guideline" sentence and, as such, the district court was required to thoroughly articulate its reasons for departing from the Guidelines. *See Smith*, 440 F.3d at 707. Because we find the sentence properly calculated under the Guidelines we need not address this argument.