IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 10, 2008

Charles R. Fulbruge III
Clerk

No. 07-30292
Summary Calendar

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

MICHAEL PRINCE

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana, Lafayette
6:03-CR-60032-1

Before STEWART, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Michael Prince was convicted for healthcare fraud and sentenced to forty-one months of imprisonment. On appeal, he argues that the evidence was insufficient and that a jury instruction on deliberate ignorance was given in error. We disagree with these arguments and affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

FACTS

Prince, through his corporation Prince Consulting Services, Inc., engaged in the business of establishing and assisting in the operation of home health and physical rehabilitation centers. Although Prince attended medical school, he was ineligible to graduate and was dismissed from the program due to repeated failures of the national medical exam. He never received his medical degree and was never licensed as a doctor. There was evidence that Prince presented himself as a doctor and even signed his name as a doctor. Prince was involved in at least eleven clinics with locations in Louisiana, Texas, Tennessee, and Illinois. The operation of Alpha Healthcare clinic in Opelousas, Louisiana, led to Prince's indictment.

In 2000, Prince partnered with Pamela Sampson and psychiatrist Dr. Sharon Inglehart, to open the Alpha clinic. As equal partners, Sampson was responsible for running Alpha while Prince and Dr. Inglehart provided the startup funding and organizational support. Sampson had never before operated a physical medicine clinic and had no experience with Medicare billing.

Prince instructed Sampson to use a company owned by Prince's wife for all of the billing, and to use Prince's brother for financial bookkeeping. Sampson acquired forms from and observed the operation of a clinic in which Prince was involved, located in Baton Rouge, Louisiana. Alpha was established by August 2000, and began taking patients in October 2000. In November 2000, Dr. Inglehart left the partnership.

There was evidence that clinic employees would complete patient paperwork and then send a facsimile copy to Prince in Houston, Texas, where he maintained his office. A partially completed physician's order form was also forwarded to Prince by a facsimile copy. Prince would then return a completed prescription form with a diagnosis and treatment plan. Physical therapy technicians employed by Alpha would administer prescribed treatments to

2

patients, often in the homes of patients. Physical therapy technicians are not licensed or otherwise certified. Because of the absence of certification, treatments must be given under the supervision of a physician. The technicians here were not supervised by a state-licensed physician while administering treatments. There was testimony that one technician never received adequate instruction on administering electrical stimulation treatment and was afraid she would shock a patient.

There was evidence that Prince instructed technicians to fill out billing sheets by recording the number of areas of the body that received treatment. For example, treatment to both shoulders and both knees would be recorded as four billing units with no reference to how much time it took to accomplish the treatments. This method of billing Medicare was improper. Medicare required time-based as opposed to treatment-based billable units. Technicians would typically spend between twenty to sixty minutes with a patient in a single day; they would not spend several hours per patient as the Medicare billing indicated. The billing sheets were forwarded to the company operated by Prince's wife and then submitted to Medicare for payment.

Another component of the purported fraud arose from the requirement that the bills needed to be submitted under a physician's Medicare provider number. The evidence at trial was that Prince hired some physicians, that often the provider number was not of a physician then-working at the company, and that no physician was employed by Alpha during certain periods.

The practices at Alpha resulted in Medicare's suspending all payments in April 2001. Sampson notified Prince of the suspension of Medicare benefits and the clinic ceased doing business. A subsequent investigation revealed that many of the claims and services provided by Alpha were medically unnecessary, that charts lacked physician's signatures, and the billing was grossly inflated. The

investigation concluded that Alpha was overpaid $584,710.41 for the short time it was in business.

Both Sampson and Prince were charged with healthcare fraud. Sampson pled guilty and agreed to testify against Prince. After a trial, a jury convicted Prince of one count of healthcare fraud under 18 U.S.C. § 1347. The district court sentenced Prince to forty-one months' imprisonment, three years post release supervision, and restitution to Medicare in the amount of $584,710.41. Prince timely appealed his conviction.

## DISCUSSION

### I. Sufficiency of Evidence

At trial, counsel for Prince moved for acquittal at the close of the Government's case in chief, and his motion was denied. The motion for acquittal was not renewed after Prince presented his defense. Under these circumstances, whether there was legally sufficient evidence to convict Prince is reviewed only for "manifest miscarriage of justice." United States v. Avants, 367 F.3d 433, 449 (5th Cir. 2004). To merit reversal, "the record must be devoid of evidence of guilt or the evidence must be so tenuous that a conviction is shocking." Id.

Prince argues that the plain error standard is too forgiving of evidentiary default, and that review by the Court of this trial's evidence should be to determine whether it was sufficient to allow a rational jury to find guilt beyond a reasonable doubt. See United States v. Mitchell, 484 F.3d 762, 768 (5th Cir. 2007) (stating the usual standard of review). Prince's objection to the review standard is academic, because we conclude that the evidence presented at trial, when viewed in a light most favorable to the verdict, is clearly sufficient for a rational jury to have found Prince guilty beyond a reasonable doubt.

As to the evidence, Prince's defense was essentially that he misunderstood the complicated Medicare billing rules. He asserts that he never had an intent to defraud but simply made honest mistakes due to the complexity of it all. One

4

example concerns "billing units." The billing units that appear on bills submitted to Medicare for reimbursement are supposed to refer to fifteen minute units of time, while Prince alleges that he thought that a unit referred to a treatment given to a particular part of the body. Louisiana's Medicare director testified that, outside of the physical medicine field in which Prince's clinics operated, Medicare is to be billed on a per procedure basis, not in time units. Whether Prince's pleas of honest confusion were plausible depends on the totality of the evidence. We will examine the key evidence.

The statute under which Prince was convicted provides that the offense is committed by any person who:

> knowingly and willfully executes, or attempts to execute, a scheme or artifice–
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program. . . .

18 U.S.C. § 1347. Evidence of aiding and abetting in the commission of healthcare fraud also allows conviction. To convict Prince under Section 2 of this statute, Prince must have "associated with a criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful." United States v. Akpan, 407 F.3d 360, 371 (5th Cir. 2005) (internal quotation marks and citation omitted).

The evidence at trial established that Prince was the only Alpha partner who was experienced in physical medicine clinics and billing Medicare for these services. There was evidence that prescription forms were sent by facsimile copy to Prince; they were returned to the clinic with a prescribed treatment plan. There was evidence that Prince instructed Alpha employees in improper billing practices, billing for treatments to areas of the body and not in units of time. This practice grossly inflated the bills submitted to Medicare. Although the

treatment forms sent in to Alpha by Prince were billed under physician provider numbers, the treatments were not rendered by physicians or under the supervision of physicians. Testimony established that of the numerous clinics in which Prince was involved, Prince had expressed that he did not expect the clinics to stay in operation longer than twelve months.

Evidence was also presented that Prince possessed Medicare informational materials, including materials that revealed the codes for billing physical medicine services, that explained the proper billing methods. Sampson asked a Medicare representative whether Alpha was in compliance with Medicare regulations because there was no direct supervision of technicians by a licensed physician. After Sampson's discussion, there was no doubt that Alpha was not complying with Medicare regulations. After Prince was informed of this, the problems at Alpha were not corrected. Prince blames Sampson, but jurors were entitled to conclude from this evidence that the improper billing practices were implemented and always controlled by Prince.

Other evidence of guilt comes from the testimony of one of the first physicians affiliated with Alpha, Dr. James Hines. Dr. Hines believed Prince was a medical doctor. Prince hired him in early 2000 to work at a clinic in Baton Rogue, Louisiana. Dr. Hines became concerned with the Baton Rogue clinic's practices, including the unsupervised treatments rendered by technicians to patients at home and numerous claims Medicare denied that were submitted under his individual provider number. Dr. Hines discovered that treatments needed to be supervised by a physician. He discussed these concerns with Prince and also expressed concerns about the billing practices. Dr. Hines was particularly concerned that he could not review the billing paperwork prior to its submission to Medicare. Prince responded that he had consulted with an attorney on the issue of physician supervision regarding the operations at one

of the Texas clinics and was satisfied. Prince told Dr. Hines not to be concerned with the billing practices because he had been hired to be a physician.

Dr. Hines was affiliated with Alpha for no longer than six weeks, and was only involved with Alpha for an insignificant amount of time each week. He completely disaffiliated from Alpha in October 2000.

Two other physicians testifying at trial included Dr. Joseph Diggs and his brother, Dr. George Diggs. Dr. Joseph Diggs testified that he initially planned to work at Alpha but changed his mind. Though Dr. Joseph Diggs was neither employed at Alpha nor involved with any Alpha patients, his provider number was listed as the treating physician for numerous Alpha patients.

Dr. George Diggs testified that Prince assured him that Alpha was competent to operate the clinic because Prince was involved with other clinics that were successful. George Diggs believed that Prince was a doctor and that Prince was issuing prescriptions for patients being treated at Alpha. Dr. Diggs did not maintain normal working hours at Alpha. He held other regular employment and would primarily visit Alpha patients on Thursday evenings after work and on Saturdays. Dr. George Diggs testified that his signature appeared on patient documents he never signed, inappropriately appeared on other patient files, and that his provider number was used for treatments given to patients he never treated. Of the $1,192,212 which Alpha billed to Medicare, $1,096,687 was billed under the individual provider number of Dr. George Diggs. Some of the billings were for dates when Dr. Diggs was not employed at Alpha.

There were several weeks between the time Dr. Hines departed in October and when Dr. George Diggs arrived in November that there was no physician affiliated with Alpha. The evidence was clear that even when Alpha employed physicians, the physicians were never employed in a full-time capacity, and worked as little as one day each week.

There was also evidence that Kevin Beasley, the administrator of the Illinois clinic in which Prince was involved, was informed by Medicare that improper billing for services was occurring. Beasley contacted Medicare after claims were denied due to improper billing. When Beasley informed Prince about this discovery, Prince instructed him not to contact Medicare because calling them too much would "raise red flags."

This summary of the evidence reveals that Prince had access to resources fully explaining the proper methods of billing, including manuals, monthly newsletters, workshops, and individual meetings with local area representatives. Dr. Hines, Beasley, and Sampson all inquired about proper billing practices and were informed of the regulations, but Prince refused to change billing practices. The jury was entitled to conclude that Prince was no amateur Medicare provider. The evidence established that he was involved in numerous clinic operations, having an ownership or significant consulting role in multiple clinics, and had been in business since 1999. The evidence was sufficient for a jury to conclude that Prince committed healthcare fraud.

## II. Deliberate Ignorance Jury Instruction

Prince argues that the district court erred in giving a jury instruction on deliberate ignorance. When a defendant alleges error in the giving of an instruction, we review the issue by determining whether the entire set of instructions collectively made a correct statement of the law, and whether those instructions explained the law that applied to the factual issues that the jurors had to resolve. United States v. Cartwright, 6 F.3d 294, 300 (5th Cir. 1993).

An instruction concerning a defendant's deliberate ignorance allows jurors to find willfulness even if they are not convinced that the defendant knew of the charged illegal conduct. Id. at 301. The instruction is proper where a defendant "claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." Id.

8

Prince alleged that the identified errors were honest mistakes. His defense included that he lacked the knowledge required to participate knowingly or willfully in the fraudulent billing of Medicare. There was evidence that Prince was made aware of the problems with the lack of physician supervision of technicians and improper billing methods at Alpha and other clinics. The jury properly could have concluded either that Prince knew of and consciously ignored the proper billing procedures, or alternatively that Prince chose not to inquire about and correct the erroneous practices of his clinics even after he was notified of the errors by multiple parties.

In light of Prince's defense to the charges and the evidence in the record, the district court did not err in giving the deliberate ignorance instruction.

The conviction is AFFIRMED.