**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

_____

No. 93-4864

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross Appellant,

VERSUS

VICTOR M. PAZOS,

Defendant-Appellant,
Cross Appellee.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____

(June 15, 1994)

Before REYNALDO G. GARZA and DeMOSS, Circuit Judges, PARKER[*],
District Judge.

REYNALDO G. GARZA, Circuit Judge:

Victor M. Pazos appeals his conviction for arson and four
counts of mail fraud.  The Government cross-appeals the district
court's application of the Sentencing Guidelines.  Finding no
error, we AFFIRM.

_____

[*] Chief Judge of the Eastern District of Texas, sitting by
designation.

# I. PROCEDURAL HISTORY

On March 5, 1993, Victor M. Pazos was convicted in the United States District Court for the Eastern District of Texas, Beaumont Division for Arson in violation of 18 U.S.C. § 844(i) and four counts of Mail Fraud in violation of 18 U.S.C. § 1341. At the sentence hearing Pazos had no objections to the pre-sentence report. The Government, however, objected because it wanted the district court to increase the base offense level from 20 to 24. The district court overruled the Government's objections and sentenced Pazos to imprisonment for a term of 36 months as to each of the five counts, with the sentencing to run concurrently. Pazos timely appealed to this court with regard to sufficiency of the evidence on all five counts. The Government cross-appeals with regard to the district court's application of the Sentencing Guidelines.

# II. FACTS

Victor Pazos and his wife Cheri Pazos, and her father, Leroy Bernard, formed a corporation to open Bernard's Cajun Restaurant. Leroy Bernard, acting on behalf of the restaurant, leased the premises for the restaurant from Jack Brookner. The terms of the lease called for the restaurant to pay $2,000 per month in lease payments, which were due on the first of each month and 4% of the previous months gross sales, which were due on the tenth of each month. Leroy Bernard purchased insurance for the restaurant and obtained content insurance of $55,000 and loss of earnings insurance of $30,000. In January of 1991, Victor Pazos increased

the content insurance to $75,000 and the loss of earnings insurance to $60,000.

The Pazos and Leroy Bernard lived in a two-bedroom apartment located approximately 150 feet from the restaurant. Leroy Bernard would open up the restaurant in the mornings and the Pazos would close it each night. Leroy Bernard, Pazos and his wife, and Jack Brookner, each had a set of keys to the restaurant. An extra set of keys was kept in the restaurant's safe. The building that housed the restaurant was equipped with a security system and it was customary to set the alarm when closing the restaurant for the night. Each of the Pazos and Leroy Bernard knew the security code to the burglar alarm system.

The building that housed the restaurant had a door on the west side of the building that was used primarily as an emergency exit door. The west exit door was customarily kept unlocked during business hours and locked at night when the restaurant was closed. On one prior occasion, Leroy Bernard had found the west exit door unlocked when he opened the restaurant.

Bernard's Cajun Restaurant opened for business on November 12, 1990. The restaurant sustained a net loss for each of the three months it was open for business. In November of 1990 the restaurant sustained a net loss of $15,118, in December of 1990 it sustained a loss of $4,901, and in January of 1991 it sustained a loss of $4,865. Victor Pazos' bank accounts at the time of the fire reflected balances of less than $6,000. Payroll of almost $6,000 had accrued, and was to be issued a couple of days after the

3

fire. Jack Brookner testified that the restaurant's lease payments and percentage of sales payments were constantly late. He also testified that utility bills were delinquent.

January 27, 1991 was Super Bowl Sunday and the Pazos went to the restaurant around 1:20 p.m. There was a beer promotion sale and Victor Pazos took the television set from the apartment to the restaurant to watch the Super Bowl Game. Leroy Bernard was also in the restaurant that afternoon. Sometime around 8:00 p.m., the Montondons, friends of the Pazos, appeared at the restaurant. The Montondons and the Pazos decided to go to dinner. Victor Pazos invited his father-in-law, but he declined.

After dinner with the Montondons, the Pazos returned to their apartment. After returning to their apartment at approximately 10:00 p.m., Victor Pazos went to the restaurant and shortly thereafter returned with the television set. Sometime around 11:10 p.m. Victor Pazos again left his apartment and went to Kroger's Food store to purchase some Alka-Seltzer for his upset stomach.

On January 28, 1991, at approximately 12:22 a.m., a fire at Bernard's Cajun Restaurant was reported to the Beaumont Fire Department. The fire officials discovered paper trails throughout the restaurant. The fire fighters noticed what appeared to be flammable liquid on the paper trails and on the carpet. They estimated that the fire had been burning 20 to 30 minutes prior to their arrival at the scene. The fire was most severe toward the back of the building. The fire alarm box had been opened and the battery removed so as to make the fire alarm inoperable. A wire

4

from the alarm box was hanging as though someone may have tampered with it.

Bradley Pennisson, Captain with the Beaumont Fire Department, inspected the building and he too observed paper trails throughout the restaurant. He also observed that the stairway leading to the attic had been pulled down and a separate fire had been started in the attic. He determined that several separate fires had been set throughout the restaurant. Captain Pennisson further observed that the west exit door to the restaurant had a double cylinder dead bolt that was in an unlocked position. It was his opinion that the exit door was unlocked at the time of the fire. There were no other signs of entry into the building other than the west door being unlocked.

Captain Pennisson spoke with Victor Pazos at the scene of the fire and Pazos advised him that to his knowledge he was the last person in the building and that he had locked up the building. Captain Pennisson asked Pazos if he had any problems with anybody and Pazos responded that he had problems with two former employees. While speaking with Pazos, Captain Pennisson did not detect any odor of any gas or petroleum type products on Pazos.

Chief Fire Marshal Jack Maddox took a sworn statement from Victor Pazos immediately after the fire. Pazos stated that he had not noticed anything missing out of the restaurant. Later it was proven that Pazos was aware that $2,000 of the restaurant's proceeds were actually missing at the time he made the written statement. Pazos' statement also stated that he started the

5

business with money given to him from his father. Later it was proven that Pazos actually opened the business with insurance money he received from previous insurance claims. The statement indicated that the restaurant was profitable, when in fact, it was losing money. The statement also indicated that after Pazos returned to his apartment at 10:00 p.m., he stayed there until the fire was discovered. It was later shown that Pazos left his apartment after 10:00 p.m. to purchase Alka-Seltzer from a nearby grocery store.

Leroy Bernard testified at trial. Bernard testified that he provided the expertise with his restaurant experience and that Victor Pazos provided all of the capital investment to start up the restaurant. He also testified that Pazos was unsuccessful at getting loans from banks. He further testified that it was Pazos' idea to increase the insurance on the restaurant.

Robert Davis also testified at trial. He owned the security service company which installed and monitored the burglar alarm at the restaurant. Computer records were introduced at trial that showed that during the week before the fire, the alarm was set each night and disarmed the following morning. However, on January 27, the night of the fire, the records showed that the alarm was never activated. According to Davis, there was no reason to believe the computer malfunctioned.

George Haynes, an insurance salesman, also testified. He testified that shortly after January first, Pazos called him and inquired about the status of the content and loss of earnings

6

insurance on the restaurant.  Pazos also wanted to know how the content and loss of earnings coverage would apply in the event of a fire.  Thereafter, Pazos called the insurance company and requested an increase on the content and loss of earnings coverage.

Finally, Jack Morman testified.  Morman was the fire insurance adjuster on the restaurant fire.  Morman received mailed letters from a public adjuster hired by Pazos in Pazos' claim on damages from the fire.  The form letters, which were introduced into evidence and made the basis for counts II through V of the indictment, dealt with matters concerning the adjusting of the insurance claim by Pazos.  These letters directly affected the way Morman handled the adjusting of the claim.

## III. DISCUSSION

Pazos claims that there is insufficient evidence to sustain his conviction for arson and for the four counts of mail fraud. The Government cross-appeals claiming the district court erred in applying a base offense level of 20, rather than 24 under section 2K1.4 of the Sentencing Guidelines.

A.   <u>Is there sufficient evidence to sustain the conviction for arson?</u>

Pazos argues that there is insufficient evidence to sustain his conviction for arson.  He claims that he was never shown to have had the opportunity to commit arson in this case.  The evidence shows that Pazos went to the restaurant around 10:00 p.m. to retrieve a television set and returned to his apartment within a short period of time.  Pazos claims, however, that the evidence shows that someone spent time laying many paper trails throughout

7

the restaurant and in the attic. The evidence also shows that Pazos left his apartment around 11:15 p.m. to purchase Alka-Seltzer and returned around 11:45 p.m. The Government's exhibit showed that Pazos purchased the Alka-Seltzer at 11:34 p.m. Pazos claims that the time to travel to the grocery store and back to his apartment does not leave ample time to set up the massive preparation necessary for the fire.

Pazos also argues that there was no evidence that he possessed any unique knowledge of flammable materials. He claims that the record is devoid of any evidence that he was in possession of any materials that could have been the flammable substance used to start the fire. Pazos claims that at least three different investors were willing to help him out financially. Finally, Pazos claims that the Government at best raises speculations and conjecture as to his guilt.

In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. United States v. Pruneda-Gonzalez, 953 F.2d 190, 193 (5th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 2952 (1992).

To convict Pazos of violating 18 U.S.C. § 844(i), the Government must prove beyond a reasonable that he: (1) maliciously damaged or destroyed a building or personal property, (2) by means of fire, and (3) the building or personal property was being used in activity affecting interstate commerce. See, United States v.

8

Triplett, 922 F.2d 1174, 1177 (5th Cir.), cert denied, ___U.S.___, 111 S.Ct. 2245 (1991).

At trial, the jury heard extensive evidence of the restaurant's financial difficulties. The jury also heard testimony that Pazos inquired about what effects a fire would have on his insurance recovery, and then increased his insurance coverage. The jury further heard that Pazos would be the beneficiary of $135,000 in insurance proceeds if the insurance company paid damages because of the fire loss. Finally, the jury learned that the restaurant operated its business by purchasing seafood which crossed in interstate commerce.

The evidence showed that Pazos had the opportunity to prepare and set the fire on at least two occasions after the business closed and before the fire fighters arrived at the scene. The evidence also linked Pazos to the fire due to his possession of a key to unlock the back door where the fire was the most serious. The only people besides Pazos who had a key to the back door were the building owner and Pazos' wife and father-in-law. There is no question that Pazos' wife and father-in-law stayed in the Pazos' apartment after 10:00 p.m. The testimony of the various fire investigators, who pronounced the fire as being intentionally set, was not disputed.

Pazos testified that when he locked up on the night of the fire, the back door was secured and the alarm set. Pazos also testified that he later went back to the restaurant, unlocked the front door, disarmed the alarm, retrieved the television,

9

reactivated the alarm, and locked the front door as he left.  This testimony was in direct conflict with the alarm records which showed that the alarm was not activated on the night of the fire, and the fact that, according to the fire investigators, the back door was unlocked.

Based on the evidence outlined above, a reasonable jury could determine beyond a reasonable doubt that Pazos committed arson.

Our review of the record, therefore, indicates that sufficient evidence exists to affirm Pazos' conviction for arson.

B.    Is there sufficient evidence to sustain the conviction on four counts of mail fraud?

Pazos contends that the evidence is insufficient to sustain his conviction on four counts of mail fraud.  Government exhibit #14 was a letter from Alex N. Sill Company directed to Morgan, the fire insurance adjuster, advising him that they had been employed as a public adjuster by Pazos in his insurance claim.  Government exhibit #15 was a letter from Alex N. Sill Company directed to Morgan requesting a $5,000 advance to assist the insured for out of pocket expenses.  Government exhibits #16 and #17 were letters from Alex N. Sill Company directed to Morgan requesting extensions of time to file a proof of loss.

Pazos claims that the use of the mails was not an integral part of the scheme to defraud the insurance company and the four letters to Morgan were not an integral part of the execution of the scheme as required in United States v. Blackenship, 746 F.2d 233, 241-42 (5th Cir. 1984).  Pazos further claims that since he never filed a claim for payment under the restaurant's insurance policy,

10

there cannot be a scheme to defraud.

To determine the sufficiency of the evidence, we use the same standard that was outlined in section III.B of this opinion.

In order to convict Pazos of mail fraud under 18 U.S.C. § 1341, the Government must establish: (1) a scheme to defraud, (2) which involves a use of the mails, (3) and that the mails were used for the purpose of executing the scheme. United States v. Kent, 608 F.2d 542, 545 (5th Cir. 1979), cert. denied sub. nom., Patrick Petroleum Corp. of Michigan v. U.S., 446 U.S. 936 (1980). Each separate use of the mails to further a scheme to defraud is a separate offense. United States v. McClelland, 868 F.2d 704, 706 (5th Cir. 1989). The Government need not prove that the accused used the mails himself or actually intended that the mails be used. Id. at 707. The requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents which passed through the mails. Kent, 608 F.2d at 546. It requires that the item mailed was an integral part of the execution of the scheme so that the use of the mails was in this way incident to an essential part of the scheme. Id.

All the letters concerned the disposition of fire insurance proceeds of Bernard's Cajun Restaurant. These actions coupled with Pazos' efforts in increasing the content and loss of earnings insurance shortly before the fire show that the mailings were essential to Pazos achieving his goal of receiving the insurance proceeds for the fire he intentionally set.

11

Based on all the evidence, a reasonable jury could conclude beyond a reasonable doubt that there was a scheme to defraud the insurance company, that the mail was involved as a vehicle to carry out the scheme, and that the letters furthered Pazos' scheme to collect his fraudulent insurance claim.

Our review of the record, therefore, indicates that sufficient evidence exists to affirm Pazos' conviction for mail fraud.

C.    Did the district court err in refusing to apply a base offense level of 24 under the Sentencing Guidelines?

At Pazos' sentencing, the presentence report prepared by the probation officer recommended an offense level of 20 pursuant to U.S.S.G. § 2K1.4(a)(2)(B).  The Government objected to this recommendation.  The Government argued that since the fire fighters were placed in substantial risk of serious bodily injury or death in fighting the blaze, and since the jury's verdict reflected a determination that the defendant intentionally set the fire, the base offense level should be 24 pursuant to U.S.S.G. § 2K1.4(a)(1). The district court ruled that the probation officer was correct and sentenced Pazos according to a base offense level of 20.

The Government argues that the district court erred in refusing to apply a base offense level of 24 under the Sentencing Guidelines.

We accept a district court's findings of fact unless they are clearly erroneous. U.S. v. Henderson, 19 F.3d 917, 926 (5th Cir. 1994).  Application of the facts to the Sentencing Guidelines, however, is a question of law subject to de novo review. United States v. Shell, 972 F.2d 548, 550 (5th Cir. 1992).

12

Sentencing Guidelines section 2K1.4(a)(1) states that a base offense level of 24 applies:

> if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; . . . .

The application notes specifically state that creating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters.

Sentencing Guidelines section 2K1.4(a)(2)(B) states that a base offense level of 20 applies if the offense:

> involved the destruction or attempted destruction of a structure other than a dwelling; . . . .

At sentencing, the Government put forth Bradley Pennisson, an investigator with the Beaumont Fire Department. Pennisson testified that he thought that the firemen who fought the blaze were substantially endangered. The district court overruled the Government's objection and specifically found that the probation officer had correctly calculated the base offense level as 20. By doing so, the district court made an implied finding that the fire did not create a substantial risk of death or serious bodily injury. The Government has failed to show why this finding is clearly erroneous. See Henderson, 19 F.3d at 926.

We, therefore, affirm the district court with regard to its ruling that a base offense level of 20 applies to this case.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

13