# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20222

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICHARD M. PLATO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CR-263-1

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

PER CURIAM:*

## I.   FACTUAL AND PROCEDURAL HISTORY

Defendant Richard M. Plato ("Plato") appeals his jury convictions for mail fraud and conspiracy. Broadly speaking, the Government's charges against Plato were based on allegations relating to Plato's role as the President and CEO of Momentum Production Corporation ("MPC").[1] Due to the detailed

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Though Plato's brief refers to "Momentum Production Company," rather than "Corporation," the record and sales agreement indicate that the actual name is "Corporation."

No. 13-20222

discussion necessary for the issues before us, these sections describe only those facts critical to understanding the case as a whole. In turn, facts with issue-specific relevance are set out in the section addressing those issues. Unless otherwise noted, the following facts are undisputed.

Plato's Criminal History.[2] Prior to the events forming the basis of his conviction, Plato was convicted of several crimes involving fraudulent conduct, resulting in significant restitution obligations. As discussed further below, the Government partially based the instant charges against Plato on his failure to disclose to investors this criminal history and the related restitution obligations.[3] Plato was released from prison in 2002, with a combined restitution total of almost $30 million. A former attorney, Plato surrendered his license to practice law as part of a prior plea agreement.

MPC Revival. After his release from prison, Plato reinstated MPC, which had gone dormant since Plato originally formed it in 1992, and began the primary business of MPC: acquiring mineral leases for shut-in oil and gas wells, and then refurbishing the wells such that, at least theoretically, MPC could operate them at a profit. MPC did not turn a profit during 2002 and Plato testified that, in 2003, MPC reported a negative taxable income of $547,000.

---

[2] Plato's trial counsel first objected to the admission of Plato's prior restitution orders, not his convictions, and later objected under Federal Rule of Evidence 403 to the testimony regarding his criminal history. However, Plato does not challenge the admission of this evidence on appeal, and it is therefore waived. *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004).

[3] As general counsel for a chemical company, Plato transferred company funds into a separate account, and used those funds for personal gain. As a result, Plato pleaded guilty to one count of conspiracy and multiple wire-fraud counts, resulting in a sentence of 57 months' imprisonment and restitution of $8.8 million. Additionally, Plato pleaded guilty to wire fraud and two counts of money laundering, resulting in a sentence of 57 months' imprisonment, served concurrently with the chemical-company sentence, and restitution of over $16.5 million. Further, based on a check-kiting scheme, Plato later pleaded guilty to four counts of bank fraud, resulting in a sentence of 30 months' imprisonment and restitution of $4.8 million.

During this time, MPC acquired three oil and gas leases in the Robinette Fields. In 2003, Plato hired John Wagner ("Wagner") to serve as MPC's accountant. Supported by documentary evidence, Wagner testified to MPC's consistently poor financial straits, specifically that MPC had a cash shortfall of $230,000 by the end of 2004; that such six-figure shortfalls were common because MPC was "continually short of money" from 2003 to 2005; and that MPC owed six-figure sums to royalty interest holders, totaling $647,000 by the end of 2005. MPC was not profitable on the basis of these figures alone.

In addition, moreover, the jury heard evidence that Plato arranged for significant personal expenditures. Plato and Wagner made payments from MPC's operating account to several non-business-related accounts and entities, and the funds were then used for the benefit of Plato, his wife, and one of Plato's mistresses. These entities and accounts included: (1) a billing account labeled "Suspense," which was used for non-salary transfers to Plato, and MPC transfers to Charlotte Donovan, Plato's mistress; (2) MDP Royalty Trust, the funds of which were used by Plato's wife, Micheal Plato; and (3) TRN Investments, a limited liability company created by Plato, into which Plato and Wagner transferred funds for the benefit of Plato's other mistress, Tammy Norris. MPC also directly transferred funds to a "fishing camp" owned by Plato's family. Testimonial and documentary evidence supported Plato spending over $500,000 of company funds on these accounts and entities by the end of 2004.

The Notes and Investors. In 2004, Wagner advised Plato by letter that the company could not continue operating without additional funds. To raise money, Plato resorted to a series of investment products ("Notes"), each secured by a "Fund" comprising an assortment of oil and gas interests. The

four Funds at issue in this case are: (1) Robinette Fund 1; (2) Robinette Fund 1A; (3) Sullivan City Fund 2; and (4) Febronio Flores Fund 3.

Plato personally drafted the Notes, which comprised: (1) a promissory note, agreeing to repay the investment via fixed monthly payments over a fixed period of time; (2) a security agreement, which described collateral for repayment in the event of default on the promissory notes; and (3) a subscription agreement, which nominally made two assurances to investors, first limiting the number of Notes sold per Fund, and second restricting the use of the collateral to a single Fund.

Plato then hired Derek Walker ("Walker") to market and sell the Notes as the primary investor contact. Over the subsequent 18 months, MPC raised approximately $6 million through offering the Notes, with attendant guaranteed returns to investors of nearly $9 million. During the same period, MPC earned only $1.36 million from oil and gas revenues. Due to the insufficiency of income, Wagner and Plato used new-investor money to make required payments to older investors. At the end of 2005, MPC's debt exceeded $1 million, as it added $700,000 in vendor debt upon that which it had already accrued, and owed royalty interest holders a full $647,000. During that same time, Plato's personal expenditures, facilitated through the aforementioned accounts and entities, exceeded $1 million.

MPC made its last scheduled payment to investors in November 2006, but sold its last Note in December 2006. Although MPC later made intermittent payments, and ultimately settled with a few investors, MPC only returned $2.7 million of the $6 million invested and many investors did not recover fully.

The Trial. In the fourth superseding indictment, the Government charged Plato with one count of conspiracy to commit mail fraud, seven counts

of mail fraud, and two counts of securities fraud. The Government presented testimony from the investors and Plato's business associates, as well as documentary evidence. Plato's challenges involve the following rulings by the district court during trial: (1) the district court's denial of Plato's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29; (2) the district court's grant of the Government's motion *in limine*, which prevented Plato from discussing Walker's dismissal during closing arguments; (3) the district court's admission of testimony by Rani Sabban ("Sabban"), a government investigator, regarding his investigation of MPC and Plato; (4) the district court's admission of testimony by Wagner regarding his and Plato's involvement with uncharged crimes of tax fraud, wire fraud, and money laundering; and (5) the district court's denial of a jury instruction on puffery. The district court acquitted Plato on two counts of mail fraud at the close of the Government's case based on the lack of testimony of investors involved in those counts, and acquitted Walker of conspiracy, the only count then remaining against Walker.

Conviction and Sentencing. The jury convicted Plato on the five remaining counts of mail fraud and one count of conspiracy, and acquitted him of the two counts of securities fraud. The Presentence Investigation Report ("PSR") ultimately calculated a total offense level of 35 after applying several enhancements to which Plato objected at the time of sentencing.[4] After denying Plato's objections to the PSR, the district court ordered a within-guidelines sentence of 235 months' imprisonment.[5] Plato appeals the denial of his

---

[4] *See* USCA5 (SR): 859-61 (PSR delineating enhancements), 926-29 (Plato asserting objections).

[5] USCA5 (SR): 930 (denial of relevant objections), 939 (sentencing).

**5**

objections to the following enhancements: (1) 18 levels for involving a total actual loss of $3,064,168.64; and (2) two levels for abusing a position of trust.

## II.    EVIDENTIARY SUFFICIENCY OF MAIL FRAUD AND CONSPIRACY CONVICTIONS

Plato first argues that the district court erred in denying his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, challenging the evidentiary sufficiency of the counts on which he was convicted. In doing so, Plato challenges the general sufficiency as to all counts, but gives special emphasis to the effect of his co-conspirator's dismissal on his conspiracy conviction.

### A. Standard of Review

We review Plato's preserved sufficiency challenge *de novo*, viewing "all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict."[6] We must determine whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7]

### B. Mail Fraud

To sustain a mail fraud conviction under 18 U.S.C. § 1341, "the Government must demonstrate (1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material."[8] This court additionally recognizes a specific-intent

---

[6] *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009) (per curiam).

[7] *Id.*

[8] *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir. 2014) (internal quotation marks omitted).

requirement that the defendant "knew the scheme involved false representations,"[9] or put otherwise, that a culpable defendant "acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself."[10]

### i.     Use of Mails and Material Falsehoods

We briefly address the second and third elements, which are not directly challenged by Plato, before discussing the first element, upon which Plato's argument centers. Regarding the second element, "[e]ach separate use of the mails to further a scheme to defraud is a separate offense."[11] The Government need not show that the defendant used or intended the use of the mails, but merely that the scheme depended on information or documents passing through the mails.[12] The Government provided ample evidence, both documentary and testimonial, that the mails were used to market, exchange, and make payments on the promissory notes.

Regarding the third element, a statement or omission is material if it "has a natural tendency to influence, or was capable of influencing, the decision of the decisionmak[er] to which it was addressed."[13] Plato's brief acknowledges the testimony by investors that they would not have purchased the Notes had they known there were errors or misrepresentations. Among the misrepresentations alleged at trial and discussed further below, the Government also included Plato's failure to disclose to investors his criminal history, restitution orders, and disbarment, as well as MPC's financial straits.

---

[9] *United States v. Phipps*, 595 F.3d 243, 245-46 (5th Cir. 2010).

[10] *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005) (internal quotation marks omitted).

[11] *Id.* (quoting *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir. 1994)).

[12] *See id.*

[13] *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation marks omitted).

Plato challenges the relevance of the omissions in duty-to-disclose terms, arguing that he did not have a duty under the mail fraud statute to disclose this information to prospective noteholders. However, an omission's materiality determines whether its nondisclosure can serve as a basis for fraud and Plato's argument lacks merit in light of the aforementioned investor testimony.

### ii.    Evidence of Scheme

The first element includes, *inter alia*, a scheme designed "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."[14] Plato generally argues that the jury heard evidence that his business was legitimate, that projections to investors were based on sound drilling-production estimates and profit projections, and that investors were advised in the Notes that the investment bore risks. Plato claimed to have a good-faith basis for the misrepresentations by citing his reliance on the projections of Michael McCoy, an engineer whose estimates indicated a higher profitability than what actually occurred.

However, the jury was also presented with evidence of Plato's involvement in a scheme to defraud the noteholders. Though the Government produced evidence that the marketing materials for the Notes misrepresented the degree of MPC's ownership in the oil and gas wells, and the investors relied on those misrepresentations, we need not consider these marketing-material arguments since the jury was presented with misrepresentations in the Notes themselves, which were drafted by Plato. Specifically, the evidence showed that the Notes, drafted by Plato, misrepresented various aspects of the

---

[14] *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir. 2014) (quoting *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007)).

collateral, including investors' interest therein, as well as MPC's ownership and use thereof.

Evidence supported oversubscription of the Notes. Though the Robinette Fund 1 subscription agreement limited issuance to 10 Notes, MPC issued 13; and while the Robinette Fund 1A subscription agreement limited issuance to 5 Notes, MPC issued 11. Additionally, these funds were cross-securitized in violation of the terms of the Notes when MPC used the same collateral to secure both Funds, contrary to the representations in the Funds' respective subscription agreements.

Furthermore, as components of the Notes, the security agreements stated that the "debtor is owner of the C[o]llateral, free and clear of any lien, security interest or claim of any kind other than the security interest herein granted." The Government argues that this language is a representation of MPC's 100 percent ownership in the leases. Plato counters that the "collateral" described in the Notes is merely MPC's interest in the lease, and not the lease as a whole. Even had the jury accepted Plato's characterization of the collateral description, that characterization would not prevent the jury from finding misrepresentations in the Febronio Flores Fund 3 Notes, which listed Hawkins Ranch collateral in which MPC had no interest at all. Additionally, in light of the oversubscription and cross-securitization, the accuracy of the ownership representations does not alter the jury's ability to find other material misrepresentations by Plato. We also note that the jury was presented with the above-described evidence supporting Plato's misrepresentation on the use of investors' funds, which were spent on Plato's personal expenditures and repayment of other investors, rather than primarily on the business of refurbishing and operating wells. In light of this cumulative evidence, the jury

had sufficient evidentiary grounds to reasonably disbelieve Plato and find the first element satisfied.

### *iii.    Specific Intent to Defraud*

Turning to the specific-intent requirement, Plato first asserts that his efforts to repay the noteholders and refusal to seek bankruptcy protection indicate that he did not intend to defraud investors; the jury, however, was free to discredit this evidence in light of the other evidence of knowing misrepresentations. Insofar as the specific-intent requirement involves misrepresentations, Plato broadly challenges the evidentiary sufficiency of those misrepresentations based on the acquittal of Walker, the co-conspirator alleged in the indictment. Favorably construed, the crux of Plato's argument is that Walker, as the primary point of contact with investors, was responsible for any misrepresentations and that, after Walker's acquittal, the Government did not show that Plato "knew the scheme involved false representations."[15] In support, Plato points to his testimony that he never advised Walker on marketing materials, and only had direct contact with one investor, which did not involve discussion of the Notes.

However, this argument is fatally undermined by the record evidence and this court's precedent. As noted above, the evidence supported numerous misrepresentations in the Notes themselves, misrepresentations for which Plato was directly responsible as the drafter of the Notes and President of MPC. On this basis alone, there is ample evidence for a reasonable jury to find that these misrepresentations evidenced Plato's specific intent to defraud the investors, allowing a rational trier of fact to make the specific-intent finding that Plato "knowingly acted with the specific intent to deceive."

---

[15] *United States v. Phipps*, 595 F.3d 243, 246 (5th Cir. 2010).

### C. Conspiracy

A conviction for conspiracy under 18 U.S.C. § 1349 requires proof that "(1) two or more persons made an agreement to commit [the offense]; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."[16] Proof of the foregoing benefits from the following inferences: agreement from concert of action; voluntary participation from a collection of circumstances; and knowledge from surrounding circumstances.[17]

Plato first argues for his acquittal on the conspiracy charge as a matter of law, either because Walker was acquitted as the only named co-conspirator, or because Wagner was not named as a co-conspirator. For the reasons explained below, neither argument has merit.

Citing to *Hartzel v. United States*, in which the Supreme Court reversed a conspiracy conviction due to the acquittal of all alleged co-conspirators,[18] Plato asserts that the dismissal of Walker forecloses satisfaction of the first element. As the Government points out, the overarching distinction between *Hartzel* and this case is the exclusivity of the potential co-conspirators as alleged in the indictment. In *Hartzel*, the indictment exclusively allowed the jury to consider those named in the indictment as potential co-conspirators.[19] However, in this case, the indictment's conspiracy allegation is nonexclusive, alleging Plato's conspiracy with "persons known and unknown." Where an indictment contains such language, this court has held that a person can be convicted of conspiring with unknown persons so long as "the indictment

---

[16] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).

[17] *See United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009).

[18] *See* 322 U.S. 680, 682 n.3 (1944).

[19] *Id.*

asserts that such other persons exist and the evidence supports their existence."[20] The indictment and evidence satisfy those requirements as to Wagner.[21]

Plato also appears to argue that the conspiracy conviction cannot be sustained on the theory that Plato conspired with Wagner, rather than Walker, since Wagner was not charged and only Walker was included in the indictment. As a matter of law alone, this is inconsistent with this court's precedent; this court has repeatedly affirmed conspiracy convictions where the alleged co-conspirator, like Wagner in this case, was named but not indicted.[22] Additionally, this principle is embodied in the jury instruction leaving open the possibility for a conspiracy conviction with persons not personally named in the indictment, to which Plato did not object at the time of trial, and which he does not address on appeal.

---

[20] *United States v. Lance*, 536 F.2d 1065, 1068 (5th Cir. 1976) (citing *United States v. Goodwin*, 492 F.2d 1141, 1144 (5th Cir. 1974); *Jenkins v. United States*, 253 F.2d 710 (5th Cir. 1958)).

[21] On this point, Plato asserts two related arguments. First, Plato discusses *United States v. Velasquez*, in which the Third Circuit remanded a conspiracy charge after finding a "substantial likelihood" that the conviction was "based on an impermissible determination" of a conspiracy with a later-acquitted co-conspirator. 885 F.2d 1076, 1091 (3d Cir. 1989). This argument lacks merit since the facts do not present a substantial likelihood that Plato's conviction was based on his conspiracy with Walker because Walker's dismissal occurred prior to closing arguments, and during those arguments the Government only asserted the Plato–Wagner theory, to the exclusion of the Plato–Walker theory. Likewise, Plato relies on another inapposite case, *United States v. Hernandez-Palacios*, in which this court held there was insufficient evidence to support the defendant's conviction of any individuals other than those alleged in the indictment. 838 F.2d 1346, 1349 (5th Cir. 1988). This argument is unavailing since sufficient evidence supported Plato's conspiracy with Wagner.

[22] *See*, *e.g.*, *United States v. Thomas*, 348 F.3d 78, 83-84 (5th Cir. 2003) (rejecting challenge to conspiracy conviction based on named but unindicted co-conspirator); *Lance*, 536 F.2d at 1068 (reiterating potential for conspiracy conviction with known-but-not-prosecuted co-conspirators); *United States v. Cabrera*, 447 F.2d 956, 957 (5th Cir. 1971) (per curiam).

## D. Conclusion

In sum, we conclude that sufficient evidence supported Plato's conviction on these counts, such that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## III.    RESTRICTION ON CLOSING ARGUMENT

Prior to closing arguments, the district court granted Walker's motion for acquittal under Federal Rule of Criminal Procedure 29, and then granted the Government's motion *in limine* preventing Plato from argument based on Walker's dismissal. The transcript of the ruling is as follows:

> THE COURT: All right. Number one, the motion *in limine* is granted in part, denied in part. It's granted you may not argue anything about conspiracy, not even mention him not being here. However, I will do what I always do in civil and criminal cases: Say, "Ladies and gentlemen, as you will note, Mr. Walker is no longer part of this case"; and that's all I will say.
> MR. COGDELL [Defense Counsel]: To be clear, your Honor, you are precluding me from arguing that it's unlikely or impossible for Mr. Plato to have engaged in a conspiracy with Mr. Walker?
> THE COURT: That's correct.
> MR. COGDELL: Okay.

On appeal, Plato challenges this ruling as a violation of his Sixth Amendment right to effective assistance of counsel, asserting that it restricted him from asserting a valid defense theory.

## A. Standard of Review

A component of the right to effective assistance of counsel is the right to make a closing summation to the jury.[23] This court reviews preserved Sixth

---

[23] *See Herring v. New York*, 422 U.S. 853, 858 (1975).

Amendment claims *de novo*.[24] In this context, "[t]he presiding judge must be and is given great latitude in . . . limiting the scope of closing summations."[25]

**B. Discussion**

The parties' dispute is two-fold: (1) whether the scope of the ruling itself unreasonably curtailed Plato's closing argument, and (2) whether Plato was practically prejudiced by not being allowed to address the conspiracy charge. Though the parties dispute whether Plato argued against the conspiracy charge in his closing argument, and thus avoided prejudice, the scope inquiry resolves the prejudice inquiry. We conclude that the district court's ruling reasonably curtailed Plato from arguing against the conspiracy charge on the basis of Walker's dismissal, such that Plato was able to argue against conspiracy as to co-conspirators other than Walker, regardless of whether he actually availed himself of that ability.

In the motion *in limine*, the Government sought to prevent Plato from arguing that Walker's acquittal prevented Plato's conviction for conspiracy, which, it argued, would assert an improper legal conclusion for the reasons explained above.[26] In his first argument, Plato does not challenge whether a district court can impose such restrictions, but instead broadly interprets the language of this ruling as preventing argument against the conspiracy count regarding any potential co-conspirator. In doing so, Plato relies on the broad phrasing of the initial component of the district court's ruling (*i.e.*, "you may not argue anything about conspiracy[] . . . .").

---

[24] *See United States v. Njoku*, 737 F.3d 55, 75 (5th Cir. 2013) (citing *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010)).

[25] *Herring*, 422 U.S. at 862.

[26] *See supra* Part II.C.

However, the context and language of the ruling reasonably limits the restriction to Walker alone, and Plato's characterization of the ruling is overbroad. The subject motion only pertained to Walker and the broad phrasing is immediately followed by language referencing Walker. Most weightily, the district court subsequently clarified that its ruling only prevented Plato from arguing against the likelihood or possibility of Plato conspiring "with Mr. Walker." Plato attempts to attribute the qualification "with Mr. Walker" to the Government's brief; however, as the transcript excerpt above makes clear, those words originated from defense counsel's question, which both immediately followed the ruling and clarified the scope thereof.

The cases cited by Plato in support are distinguishable in two critical respects. First, given the limited scope of the ruling, Plato was not entirely prevented from making closing arguments, as was the case in *Herring v. New York*.[27] Second, Plato was also not restricted from presenting a valid theory of defense since the Government did not assert the Plato–Walker theory during closing argument. We find no error or abuse of discretion shown with regard to the district court's grant of the motion *in limine*.

## IV.   ADMISSION OF RANI SABBAN TESTIMONY

As his third challenge, Plato appeals the jury's consideration of certain testimony by Sabban, an investigator for the Texas State Securities Board who testified as a government witness. Generally, Sabban testified regarding the financial condition of MPC at various points in time, as well as his investigation of MPC in his investigator capacity. Plato asserts error in the admission of three instances of Sabban's testimony: that Plato was untruthful

---

[27] *Herring*, 422 U.S. at 856.

regarding investor awareness of his criminal history; that Plato's business practices bore characteristics of a Ponzi scheme; and that certain payments had characteristics of "lulling payments," payments meant to placate investors.

### A. Untruthful Statement

On direct examination, Sabban testified that, during his investigation, he had asked Plato "if he had been disclosing his criminal convictions to the investors," and that Plato had answered "that some of the investors knew and some didn't." Since some of the investors had independently discovered Plato's criminal history, Plato's response to Sabban's question was technically true, and the prosecution did not challenge the veracity of Plato's response during direct examination. On cross-examination, defense counsel asked Sabban whether Plato's statement was correct; Sabban disagreed, before finally explaining that he took Plato's statement as responding affirmatively to his question (*i.e.*, "as Mr. Plato telling me if he told some of his invest -- some of the investors, whether they knew or not, and I received conflicting information later"). The challenged statement came about on re-direct, as follows:

> Q Now, Mr. Cogdell asked you if you thought the Defendant was being truthful when he made these statements to you; is that right?
> A Yes, sir.
> Q Now, based on your review of this evidence, do you believe he was being truthful when he made these statements?
> A No, I do not.

Defense counsel did not object, and we review Plato's challenge to this testimony for plain error.[28]

---

[28] *See United States v. Williams*, 343 F.3d 423, 434 (5th Cir. 2003).

The Government argues that defense counsel "opened the door" to Sabban's opinion testimony on Plato's truthfulness. We agree. In *United States v. Ruppel*, this court found that a series of questions by defense counsel "[w]hether intentional or not[] . . . conveyed the impression" that an actor in the conspiracy did not believe the defendant was aware of the activity's criminal aspect.[29] In response, the prosecution elicited a specific "No, sir" in response to the question of whether the actor believed the defendant was aware of their activity's criminality.[30] The *Ruppel* panel did not find error in the statement's admission because "counsel may not mislead the jury or convey an erroneous impression without opening the avenue for cross-interrogation for purposes of clarification."[31]

Here, the efforts by defense counsel to establish that Sabban thought Plato's response was a "true statement" (when the prosecution had not made its accuracy an issue during direct examination) ambiguously characterizes Plato's response as truthful regarding investor knowledge, or truthful regarding Plato's disclosure of the information. This ambiguity "opened the door" for the challenged statement's admission as helpful to understand Sabban's testimony, and to clarify any erroneous impression of Plato's truthfulness in responding to Sabban's inquiry. We find no error, plain or otherwise, in the admission of the challenged testimony.

### B. Ponzi Scheme and Lulling Payments

We now address the Ponzi-scheme and lulling-payments testimony. Regarding the former, Plato asserts that Sabban was allowed "to give an opinion that he observed that Mr. Plato was conducting a Ponzi scheme." Plato

---

[29] 666 F.2d 261, 270 (5th Cir. 1982).
[30] *Id.*
[31] *Id.* at 269.

takes the position that a witness may describe the characteristics of a Ponzi scheme, but that a witness "crosses the line when he is allowed to testify that the defendant on trial was running a Ponzi scheme." Plato argues that, once over the line, Sabban's testimony was speaking to Plato's intent, in violation of Federal Rule of Evidence 704(b)'s prohibition of opinion testimony regarding a defendant's intent. The Government counters that Sabban's testimony was of the former type and did not cross the line, characterizing the testimony as merely addressing the definition of a Ponzi scheme and whether Sabban's analysis of MPC's payments and expenses had characteristics of a Ponzi scheme.

Regarding lulling payments, Plato similarly charges that Sabban opined on Plato's making lulling payments to investors, such that it implicated Plato's intent, and the Government similarly argues that Sabban's testimony was limited to factual characterizations of payments.

In the first instance, we conclude that the Government's characterization is more consistent with the trial record, such that the admission did not constitute error. While Sabban's testimony approached the point of stating that Plato was conducting a Ponzi scheme or making lulling payments, Sabban refrained from direct attribution to Plato. Indeed, as the Government points out, the district court sustained Plato's objection to a more direct attribution, when the Government questioned whether Sabban found "characteristics of a Ponzi scheme in the records concerning MPC."

Furthermore, at least regarding the Ponzi-scheme testimony, Plato was not prejudiced by any error since Wagner later testified to the practice of paying old investors with new-investor money, testimony which provided sufficient evidence for a reasonable jury to infer Ponzi-scheme characteristics. Prejudice from the admission of both instances of testimony was further

prevented through Sabban's cross-examination by Plato's counsel. We find no error in the admission of Sabban's complained-of testimony and, even presuming error, find any such error harmless.

## V.    ADMISSION OF JOHN WAGNER TESTIMONY

Plato contends that certain testimony by Wagner was inadmissible, as it included evidence of extrinsic acts subject to the requirements of Federal Rule of Evidence 404(b). Plato ambiguously challenges two parts of Wagner's testimony. First, Plato challenges Wagner's testimony on direct examination that, as Plato's personal accountant, he assisted Plato in only declaring salary income for tax purposes, to the exclusion of other income Plato was receiving from MPC in various forms; as part of this testimony, Wagner admitted his personal awareness that this was wrong. Second, Plato challenges Wagner's testimony on re-direct that he committed five separate crimes with Plato. Notably, this second instance of testimony referenced Wagner's testimony on cross-examination, during which defense counsel asked for "a list of all the crimes that you say you've committed," followed by inquiries of each crime individually. Regarding the second instance of testimony, Plato asserts that Rule 404(b) prohibited such testimony since the Government gave the required 404(b) notice only for Plato's previous convictions from years prior to the alleged crimes, while Wagner's testimony included evidence of extrinsic crimes subject to notice under Rule 404(b).

### A. Standard of Review

Though the parties disagree on the applicable standard of review, plain-error review is appropriate. Plato asserts this court should review the ruling under a heightened abuse-of-discretion standard, which is appropriate for properly preserved objections to the admission of evidence under Federal Rule of Evidence 404(b). The Government counters that the claim should only be

reviewed for plain error because Plato did not object to the testimony at the time of admission. Though it is true that Plato obtained a running objection, based on relevance and Federal Rule of Evidence 403, to Wagner's first instance of testimony about his tax-preparation work during direct examination, this objection fails to preserve error as to either instance of testimony at issue here.

First, even though the tax-preparation testimony clearly falls within the scope of the objection, Plato's bases for that objection at trial were relevance and Rule 403, while his basis on appeal is Rule 404(b); as a result, no error was preserved regarding the tax-preparation testimony.[32] Second, regarding the later, crime-commission testimony, there is no record basis for applying the running objection to that testimony.[33] Even were we to construe the running objection as extending to that later testimony, it would yet fail to preserve error since a different basis is argued on appeal.[34] In sum, since Plato did not properly object to the challenged testimony, or alternatively asserts a different basis for objection on appeal, we review Plato's challenge for plain error.

## B. Discussion

As a threshold matter, the parties disagree over the application of Rule 404(b) due to competing characterizations of the evidence as intrinsic or extrinsic. The distinction is critical since Rule 404(b) enumerates purposes for which extrinsic evidence is admissible,[35] while intrinsic evidence is not subject to the prohibition of 404(a), nor to the strictures of 404(b), and is generally

---

[32] *See Williams*, 343 F.3d at 434 & n.9.

[33] Broadly, the challenged testimony concerns Wagner's commission of crimes with Plato, which Wagner listed as tax fraud, mail fraud, wire fraud, money laundering, and securities fraud; of these, only tax fraud is even tenuously connected to the earlier tax-preparation testimony to which defense counsel obtained the running objection.

[34] *See Williams*, 343 F.3d at 434 & n.9.

[35] *See* FED. R. EVID. 404(b).

admissible.[36] This court defines evidence of another act as intrinsic if the act relates to the offense in any of three ways: (1) evidence of the other act is "inextricably intertwined" with that of the offense; or (2) "both acts are part of a single criminal episode"; or (3) "the other acts were necessary preliminaries to the crime charged."[37]

Applying this rubric, we conclude that the challenged testimony qualifies as intrinsic evidence, falling outside the purview of 404(b). Wagner's tax-preparation testimony is "inextricably intertwined" with evidence of the offense-scheme, since Wagner's testimony addressed how Plato concealed the income derived from the offense-scheme on both his personal and MPC's corporate tax returns, which furthered the offense-scheme.[38] Second, although its connection to the offense is more attenuated, Wagner's testimony of wire fraud and money laundering is intrinsic as part of the same criminal episode, since those acts occurred during Wagner's employment with MPC and as a part of the offense-scheme.[39] As a result, the testimony was not prohibited under Rule 404(b) and its admission does not constitute plain error.

## VI.    OMISSION OF "PUFFING" INSTRUCTION

Plato next appeals the decision of the district court not to include a jury instruction on puffery, which provides as follows:

> A scheme to defraud is not necessarily to be inferred from business adversity or unprofitable ventures. Mere puffing, exaggerating

---

[36] *See United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007).

[37] *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (internal quotation marks omitted).

[38] Although not specifically addressed by the parties, Wagner's tax-preparation testimony regarding Plato's personal returns is part-and-parcel with testimony immediately subsequent which addresses similar concealment on MPC's corporate tax returns (USCA5 (SR): 702-05).

[39] *Cf. Sumlin*, 489 F.3d at 690 (rejecting evidentiary characterization as pertaining to "single criminal episode," in part due to testimony discussing events removed in time from offense activity).

enthusiasm, and high-pressure salesmanship, does not constitute legal fraud. This is also true as to unfilled promises, prophecies, predictions and erroneous conjecture as to future events particularly where some relate to prospective profits from business operations.

## A. Standard of Review

Regarding a district court's discretion in refusing a proffered jury instruction, this court affords a trial judge "substantial latitude in formulating the jury charge," and reviews jury-instruction refusals for an abuse of discretion.[40] "The Court may reverse only if the requested instruction '(1) is substantially correct; (2) was not substantially covered in the charge actually given; and (3) concerns an important point such that failure to give it seriously impaired the defendant's ability to effectively present a given defense.'"[41] Even then, the court will find an abuse of discretion "only if the defendant was improperly denied an opportunity to convey his case to the jury."[42]

## B. Discussion

Plato argues that the failure to include this instruction "seriously impaired" his ability to make the closing argument that Plato lacked criminal intent when he misrepresented MPC's profitability and oil production. Plato primarily relies upon *Scott v. United States*, in which this court held that the trial court erred in not giving the instruction requested in this case.[43] For its part, the Government does not dispute that the puffery instruction is supported by a sufficient evidentiary foundation, nor that it is substantially correct. Instead, it argues that puffery was substantially covered in the charge

---

[40] *United States v. Laury*, 49 F.3d 145, 152 (5th Cir. 1995) (per curiam) (citing *United States v. Aggarwal*, 17 F.3d 737, 745 (5th Cir. 1994)).

[41] *Id*. (quoting *Aggarwal*, 17 F.3d at 745).

[42] *Id*.

[43] 263 F.2d 398, 401-02 (5th Cir. 1959).

given since puffery, limited by definition to expressions of opinion, is excluded by the mail-fraud jury instruction, which required "false or fraudulent pretenses, representations, or promises." Relying on *Black's Law Dictionary*, the Government argues that since "puffing, so long as it remains in the realm of opinion or belief, will not support a conviction of false pretenses," the requested instruction was substantially covered in the charge actually given.[44]

Although this argument relies upon a subtle distinction between opinion and pretense, in *United States v. Simpson*, this court affirmed a district court's denial of a puffery instruction in a wire fraud case, reasoning that the issue was sufficiently before the jury due to the combination of the jury instructions on the offense and the defendant's closing argument.[45] Similarly, Plato's counsel was able to address the opinion–pretense distinction during his closing argument, during which counsel noted that "the valuation of gas wells is complex; and it's subjective. It can be speculative and different people can have different interpretations and opinions on it." As a result, we conclude that the puffery instruction was substantially covered, as in *Simpson*, by the combination of the district court's instruction and defense counsel's closing argument.[46] Accordingly, we find no error in the denial of the instruction.

## VII.    SENTENCING ENHANCEMENT APPLICATION

Plato's sixth challenge concerns the district court's enhancements to his sentence, but within this single challenge Plato raises two issues which we

---

[44] Appellee's Br. 59 (citing BLACK'S LAW DICTIONARY 1353 (9th ed. 2009)).

[45] *See* 440 F. App'x 393, 393-94 (5th Cir. 2011) (per curiam) (citing *United States v. Laury*, 49 F.3d 145, 152 (5th Cir. 1995)).

[46] In any event, the jury was presented with overwhelming evidence of misrepresentations relating to collateral oversubscription and cross-securitization in the Notes themselves, evidence which cannot be explained as mere marketing-related puffery, and thus the failure to give the instruction would be harmless under the circumstances shown here.

address separately. First, Plato challenges the district court's enhancement as erroneous in its actual-loss calculation. Second, Plato asserts error in the district court's increasing his sentence based on an abuse-of-trust enhancement.

### A. Standard of Review

Broadly, this court reviews a defendant's sentencing under an abuse-of-discretion standard.[47] However, we consider the propriety of a district court's guideline sentencing range in bipartite fashion, reviewing loss calculations and factual determinations for clear error, and reviewing legal questions of guidelines interpretation *de novo*.[48]

Applying that rubric to the enhancement-specific standards, our approach to the abuse-of-trust enhancement is bifurcated, applying *de novo* review to whether a defendant occupied a position of trust, and clear-error review to whether the defendant abused that trust,[49] a question involving "a sophisticated factual determination."[50] As to the loss-amount calculation, the parties dispute the standard to apply. Plato asserts that his challenge to the loss-amount calculation involves a legal question (the method of determining the amount of loss) requiring *de novo* review, relying on this court's opinion in *United States v. Harris*.[51] The district court considered whether certain property, Ricaby Field, qualified as loss-reducing collateral. As explained below, since that determination concerned questions of fact rather than law, we review the district court's loss-amount calculation for clear error.

---

[47] *See United States v. Morrison*, 713 F.3d 271, 278 (5th Cir. 2013).

[48] *See id.* at 279 (citing *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996)).

[49] *United States v. Kay*, 513 F.3d 432, 460 (5th Cir. 2007).

[50] *United States v. Wright*, 496 F.3d 371, 375 (5th Cir. 2007) (quoting *United States v. Burke*, 431 F.3d 883, 889 (5th Cir. 2005)).

[51] 597 F.3d 242 (5th Cir. 2010).

While *Harris* does stand for the proposition that the legal question of the loss-calculation method is reviewed *de novo*, it supports applying clear-error review to the factual findings at issue in this case. The *Harris* panel considered a district court's decision to aggregate the credit limits of cards used in a credit-card scheme, toward the end of calculating the intended-loss sentencing enhancement.[52] The situation required the court "to distinguish an application of the Sentencing Guidelines from a finding of fact,"[53] with appellants arguing that the decision to aggregate was an interpretation or application of the guidelines subject to *de novo* review, and the Government arguing that such review would deny appropriate deference to the intended-loss estimates as factual findings.[54] The *Harris* panel held that the amount of loss is a factual finding deserving of deference,[55] but that the court must first review *de novo* "whether the trial court's method of calculating the amount of loss was legally acceptable."[56]

The primary distinction between this case and *Harris* is that the latter involved an intended-loss calculation, as opposed to the actual-loss calculation at issue here. In contrast to actual-loss determinations, an intended-loss determination involves an inherently inferential analysis due to legal questions of calculation methodology (*e.g.*, the *Harris* question of whether the district court erred in inferring intent equal to the face value of jeopardized property[57]). In this case, on the other hand, the dispute at sentencing involved factual, not legal, determinations. At the time of sentencing, the Government

---

[52] *See id.* at 248-49.

[53] *Id.* at 250.

[54] *See id.*

[55] *See id.* at 251 n.9.

[56] *Id.* at 251 (quoting *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008)).

[57] *See id.* at 259-60.

conceded the legal, sentence-reducing impact of a finding that Ricaby Field was loss-reducing collateral. Instead, the Government challenged the factual bases of the legal effect, including the ownership of Ricaby Field, the actual value of the assets, and the reliability of the tax appraisal as evidence of ownership and value.

Since the propriety of the enhancement turns on the factual findings regarding Ricaby's ownership and valuation, this court reviews the district court's amount-of-loss calculation for clear error.[58] Applying clear-error review to both enhancements "only requires a factual finding to be plausible in light of the record as a whole," and this court only finds such error when a review of all evidence results in "the definite and firm conviction that a mistake has been committed."[59]

### B. Discussion

#### i.    *Actual-Loss Calculation*

Pursuant to Sentencing Guidelines § 2B1.1, the sentencing guideline range incorporates the amount of loss to the victims, calculated as the greater of actual or intended loss.[60] Plato's sentence was calculated based on actual loss, which is "the reasonably foreseeable pecuniary harm that resulted from the offense."[61] Pertinent here, Application Note 3(E)(ii) provides that the loss amount is reduced by the following:

> In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has

---

[58] *See United States v. Mata*, 624 F.3d 170, 174 (5th Cir. 2010) (per curiam) (citing *United States v. Solis-Garcia*, 420 F.3d 511, 514 (5th Cir. 2005)).

[59] *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011) (per curiam) (internal quotation marks omitted).

[60] U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 application n.3(A) (2014).

[61] *Id.* § 2B1.1, app. n.3(A)(i).

not been disposed of by that time, the fair market value of the collateral at the time of sentencing.[62]

After applying any credits against loss, Sentencing Guidelines § 2B1.1(b) provides for increases in the offense level based on the final loss calculation; relevant to Plato's challenge, a loss calculation of more than $1,000,000 results in a 16-level increase, while a calculation of more than $2,500,000 results in an 18-level increase.[63] The district court relied on the loss calculation of $3,051,777.44 in the PSR.  Since this amount was in excess of $2,500,000, the district court increased the offense level by 18 levels, from 7 to 25.

Plato asserts that the PSR loss calculation is erroneous, consistent with his objection at the time of sentencing, and appeals the district court's reliance on that calculation. According to Plato, the PSR excludes the value of MPC-owned assets in Ricaby Field, which, if properly included as collateral credit against the actual loss,[64] would result in a loss amount below $2,500,000 and an offense-level increase of 16 rather than 18.

However, we easily find no merit in this argument. The district court had ample factual basis to reasonably discredit Ricaby's classification as a loss-reducing asset due to questions of Ricaby's ownership, collateral classification, and valuation.

First, evidence did not establish MPC's ownership of the Ricaby assets. It is undisputed that MPC previously owned the Ricaby assets until selling them in 2007. Plato, however, asserts that MPC re-acquired those assets in 2010. In support, Plato cites to an assignment and bill of sale of the Ricaby assets to "M P C Energy, Inc., a Texas Corporation." As the Government points

---

[62] *Id.* § 2B1.1, app. n.3(E)(ii).
[63] *See id.* § 2B1.1(b)(1).
[64] Plato asserts that Ricaby Field was an asset of MPC, valued at $1,111,900.

out, however, Plato did not and has not provided any evidence that M P C Energy, Inc. is related to MPC, and the Notes do not place any obligation on M P C Energy, Inc. Plato replies that the assignment document has three references to MPC; yet, MPC is never referenced as a party to the assignment, and neither is MPC a signatory.[65] As a result, the district court had a reasonable basis to discredit MPC's ownership of Ricaby as loss-reducing collateral.

Additionally, evidence did not support Ricaby's classification as collateral from which investors could recover their losses. Toward this end, the Government points out that only one Note used Ricaby Field assets as collateral, and "[o]nly seven of the 18 'Lease Name[s]' in the tax appraisal were even arguably connected with the assets listed as Note collateral." In his reply, Plato argues that Ricaby can serve as collateral to other noteholders, since the Notes "provided that the collateral was interchangeable." However, the Note language that Plato cites in support grants to the note-maker (MPC), not to the noteholders, "the power and obligation to substitute additional oil and gas properties to satisfy the payment obligations contained herein"; Plato provides no basis for inferring that investors holding Notes for which Ricaby is not collateral were empowered to recoup losses therefrom. The parties do not discuss an additional point that renders that inference even less meritorious. As previously discussed,[66] the Notes (specifically the subscription agreements) expressly restricted the use of collateral to specific Funds, which implies that the "additional oil and gas properties to satisfy the payment obligations"

---

[65] *See* Record Excerpt 13 at pp. 1 (handwritten reference to MPC); 5 (reference to MPC as signatory of separate "Letter Agreement"); and 8 (referencing MPC as a signatory of another Letter Agreement, dated April 2, 2009).

[66] *See supra* Part I.

subject to substitution as collateral would necessarily exclude property, like Ricaby, which was already pledged as collateral in another Fund.

Lastly, evidence supported Ricaby's exclusion from the loss calculation as essentially valueless. For his part, Plato bases his value estimate on a tax appraisal valuation, while the Government instead relies on a production-value report.[67] Plato argues that the production-value report is less credible as a value metric than the appraisal, since production value would have dropped since Plato's arrest and conviction.[68] Additionally, Plato distinguishes *United States v. Nathan*,[69] the opinion cited by the Government for the credibility of more recent value estimates,[70] by noting that the *Nathan* panel merely recognized that more recent evidence would have been preferable, but was not available given the lack of any interim appraisals.[71] Ultimately, however, the dispute on this point is a factual dispute on the value of the Ricaby assets, and Plato does not provide sufficient evidence to establish the requisite "definite and firm conviction that a mistake has been committed." Accordingly, we affirm the district court's finding that the Ricaby assets did not qualify as loss-reducing collateral for the amount-of-loss calculation.

### ii.    *Abuse-of-Trust Enhancement*

We find no error in the district court's application of Sentencing Guidelines § 3B1.3. Plato occupied a position of trust as MPC's President and Chief Executive Officer, and Plato misallocated company funds for personal benefit in a manner that facilitated or concealed the offense. Therefore, we conclude that the district court had ample basis under this court's precedent

---

[67] Appellant's Br. at 64; Appellee's Br. at 65.

[68] *See* Reply Br. 17.

[69] 318 F. App'x 273 (5th Cir. 2009).

[70] Appellee's Br. 65.

[71] *See Nathan*, 318 F. App'x at 275-76.

to find that Plato occupied a position of trust and abused that position for his own personal gain.[72] Accordingly, we find no error in the district court's application of both enhancements.

## VIII.    CONCLUSION

For the foregoing reasons, the judgment and sentence of the district court are AFFIRMED in all respects.

---

[72] *See, e.g., United States v. Wright*, 496 F.3d 371, 376 (5th Cir. 2007).